CROZIER–STRAUB, Inc., et al. v. GRAHAM et al. SAME v. MELMOD et al. SAME v. DOWNER.

Circuit Court of Appeals, Third Circuit. September 26, 1928.

Rehearing Denied October 29, 1928.

Nos. 3776–3778.

Charles M. Clarke, of Pittsburgh, Pa., and Drury W. Cooper, of New York City, for appellants.

Allen S. Olmsted, 2d, Walter B. Saul, and Saul, Ewing, Remick & Saul, all of Philadelphia, Pa. (Jos. G. Denny, Jr., of Philadelphia, Pa., of counsel), for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. These three patent suits were tried together but were decided by separate decrees dismissing the bill in each case. The plaintiffs, the same in each case, appealed. The appeals were heard together, will be considered together on the issue of validity, common to all, and considered separately on the issues of infringement, different in each.

These appeals bring here again Letters Patent No. 1,212,840 issued on January 16, 1917, to Francis J. Straub for a building block and method of making the same, known in the building trade as the "cinder block" and "Straub's cinder block." The patent was first adjudicated in Straub v. Campbell, 259 F. 570, when this court held its claims valid on a very firm finding of invention. In the suits at bar the learned trial judge, though frankly stating that in his opinion the patent is invalid and expressing his belief that had the record before this court in the Campbell Case been the same as that which was before him in these cases our judgment would have been different, nevertheless felt constrained to follow the decision of this appellate court as to the validity of the patent but dismissed the bills on findings of noninfringement.

In view of this conviction of an able and earnest judge and also because the records in the two cases (regarding the last group as one litigation) are without doubt very different in volume, we shall give the issue of validity more extended discussion than is ordinarily given at a second trial on the same patent.

The building block of the patent is a simple one. It is of familiar shape and is intended generally for uses long known. Invention in the product, if any, resides in its constituents which are, cement and water (both old) and "a mixture of coarse and fine coal cinder and ashes, retaining all of the original mass." Invention in the process, if any, must be found in the manner of making blocks of this constituency; that is, "in crushing and grinding an original mass of coal cinder and ashes without separation, mixing the entire mass of coarse and fine material with a suitable proportion of cement and water, and molding and drying the same in block form."

We recognized in the Campbell Case that the use of cinders in groutings, foundations, walks, roads, and other structures was old and we learned from the few patents in the record that ashes and cinders, screened or washed or otherwise prepared and selected and proportioned with other ingredients had appeared in the patent art, but (again from the record) we found that no one before Straub had, when making building blocks, conceived the idea of taking the *whole* ash product—cinders and ash alike, half burned and wholly burned, lumps and dust—in fact,

*the entire run of the grate,* using the whole waste product in its raw state and rolling or grinding the whole mass. This process appealed to us as new and we also thought the product of the process, namely, the cinder block, was new, not in its form but in its make-up and characteristics. While in form it is that of the ordinary building block it has marked features, some improvements on old blocks, others wholly new.

All blocks are more or less soundproof but Straub's is more soundproof than others with hard aggregates, doubtless for the reason that instead of being a solid mass as when made of sand or stone aggregate it is porous, containing myriads of cells; it permits nails to be driven into it without breaking and firmly holds the nails in place; it is lighter in weight and cheaper to make than any block brought to our attention; though porous and light, it is strong; and, though strong, can be broken on nearly straight lines. With these characteristics its usefulness as a building material, especially in dispensing with the woodwork ordinarily set in the masonry for plastering, and for window-working and door working, seemed manifest. There was no evidence of how the invention was received by the trade because when that suit was brought the patent was only about a year old and but a small number of blocks had been made in the patentee's crude little plant and sold in one locality.

On the record in the Campbell Case we thought, and still think, there was invention.

From the record in the suits at bar we have discovered that the characteristic of the block which most strongly impressed us, namely, its "nailability," was not entirely new with Straub because one of the cited patents (Atterbury) disclosed a block made of cement, cinders and asbestos fibre into which nails can be driven—how effectively we do not know because as we use the term "nailability" in connection with the Straub block we do not limit its meaning to mere penetrability but extend it to holding the nails in place for the useful purpose of supplanting wood which theretofore had been employed in layers between the masonry to receive nails and hold them; yet none of the cited patents discloses a block made entirely of ash and cinder aggregate that is nailable.

■■ Just why the Straub block in comparison with other blocks is more soundproof, that it will receive and firmly hold nails, that it is readily broken along desired lines, that it is light yet strong, we do not know and seemingly Straub did not know when he was awarded the patent. But that does not mitigate against the fact of invention for it is not necessary that Straub should have understood and been able to state the scientific principles underlying his conception. Diamond Rubber Co. v. Consol. Tire Co., 220 U. S. 428, 435, 436, 31 S. Ct. 444, 55 L. Ed. 527 Nor is it necessary that a court in order to pass on the validity of a patent should in every case understand and be able to state the principles of the invention. It is not known even now why Straub's block has these qualities. It is persuasively suggested by experts that they are due to the cellular character of the block and that this is due to the natural properties of the cinder ingredient.

Confessedly the record in the Campbell Case was meager. It contained but few patents and no serious instances of prior use. The record in these cases contains 46 prior patents and publications which deal with, touch or cover ashes and cinders as aggregates in cement mixtures for a variety of purposes, disclosing a long and wide study of their uses. Regarding those patents and publications mentioned in the opinion of the District Court (where the patent numbers and publication dates may be found) as the strongest references against the validity of the patent in suit, we shall review them in order to contrast their constituents and disclosures with those of the product claim (2) of the patent, remembering that it calls for "a mixture of coarse *and* fine coal cinder *and* ashes, *retaining all of the original mass,* water and cement."

The Heim patent (1869) was for a building block of one part stone lime (the Portland cement industry was developed later), coal ashes and coal *dust* in equal quantities of four to eight parts and two parts of potash. When this substance becomes dry it is extremely hard and highly impervious. It is the opposite of the Straub block which is resilient and cellular.

The Dreyer patent (1879) disclosed a building block of one part each of Portland cement, *mineral wool* and three parts coal ashes.

The patent to Shinn (1883) proposed to make a mortar by using 80 to 90 per cent. of *finely divided* or pulverized coal ashes and 20 per cent. of hydraulic lime, cement or plaster, which may be used for making a concrete or artificial stone or brick

by mixing with *broken stone, gravel, brick,* cinder or *slag.*

Ransome patent (1885) disclosed a building block of *washed* or *purified* ashes and lime.

The patent to Lorenz (1887) was for an artificial building stone, five parts of clear ashes, four of cinders and one of cement. This looks like Straub; but Lorenz did not utilize the entire original mass; . he first mixed an arbitrary amount of fine ashes with a certain amount of cement and then added an arbitrary amount of cinders or clinkers. The resultant product was an artificial stone that could be polished. The Straub block is not susceptible of such treatment.

A later patent to Lorenz (1893) was for an artificial stone made of *burned sand,* cinders and ashes.

Krolman had a patent (1902) for a fireproof *floor* composed of one part of cement and eight to ten parts of cinders. He also used a proportion of sand. There was no suggestion that cinders in the original mass should be used.

Brunson was awarded a patent (1904) for an artificial stone consisting of cinders, *sand, barites,* cement, lime and water.

The patent to Marsden (1906) was for a building block made of ground *coal,* clinkers, ashes, cement and *calcium gypsum.* Marsden prescribed that the coal clinkers and ashes should be ground so that they will pass through a screen to about the fineness of granulated sugar. Naturally, a block of this material could be cut and sawed.

Bitterman (1912) uses *coke breeze* and cement to form building blocks and asserts that nails can be driven into them.

The invention of the patent to Atterbury (1915) is for artificial stone of crushed cinders, cement and *asbestos fibre,* the latter a highly cellular product. The blocks have a cellular texture and of course possess nailability.

The Engineering News referred to the practice of using clinkers from steam boiler furnaces for an aggregate together with concrete but prescribes that the cinders must be *washed* free of foreign particles.

The Cement and Engineering News spoke of concrete blocks formed from waste crushed clinker obtained from the city refuse destructor plant. Whether that means coal cinders or ashes of rubbish or garbage is not clear and there is no suggestion of the proportions of ashes and cinders.

The Architect's and Builder's Pocket Book wrote of one mixture made of cement and *fine* cinders and another of cement and coarse cinders. The article makes no mention of building blocks made of both fine and coarse cinders as well as intermediate sizes as in Straub.

The Proceedings of the Second Convention of the National Association of Cement Users stated that cinders are sometimes used for block work, and if *clean* and of *medium coarseness* will give fair results.

The Engineering Record, vol. 63, of 1911, merely pointed out prior knowledge of clinker concrete made of one part Portland cement and six parts crushed clinker and is silent as to whether crushed clinker is selected or is the run of the grate.

The Concrete Cement Age told of the construction of a group of houses built of steam cinder concrete in the proportions of one part of cement and seven of cinders. But this was poured concrete and not in the form of units. It does not say that the entire original mass of cinders was utilized.

The record in the instant cases also contains four instances of alleged prior public use which are cited as anticipations. Only one, that of Bell, calls for discussion.

Bell was a manufacturer of light building blocks made of gypsum and used not in weight-sustaining walls but mainly in partitions. For a short time in 1905 or 1912 he used cinders instead of gypsum in making these blocks. The cinders were crushed, then screened into two sizes, fine and coarse, and then the coarse and fine were mixed in about equal proportions with cement at about the ratio of one part of cement to seven of combined cinders. Seemingly this was the cinder aggregate of the Straub block. Just what was the sense of separating and grading the cinder mass and then combining the separated and graded portions we do not know, but we do know that the result was for some reason different from that of Straub's use of "the original mass," the straight run of the grate, unscreened, ungraded, unseparated. It was different in color, exterior surface and interior texture and in structural and compressive strength, and different in the important fact that it made no impress upon the art whatever. The block in evidence admits a nail but because of softness it will not hold it firmly. We do not regard Bell's limited practice and different product as an anticipation of Straub's invention.

We have been anxious fairly to show the difference between the record in the Campbell Case and that in the cases at bar. The latter reveals the astonishing amount of attention which for fifty years inventors in the cement art have given the subject of cinder aggre-

gates. It does not show however that their inventions made any distinctive impress upon the building art. On the contrary it proves that it was not until Straub's invention that the trade turned to blocks with cinder aggregates. Hence we must read the Straub invention in the light of the many prior patents and publications. A study of these has convinced us that our decision in the Campbell case, whether by accident or otherwise, was right. It shows that prior inventors and writers had for half a century, indeed from the very beginning of the Portland cement industry, regarded cinders as an aggregate in cement mixtures and had dealt with them in a great number of combinations and proportions and that they had hit upon nearly everything except that which Straub hit upon and had practically surrounded him, yet, we think, without touching him. In some instances they came pretty close, indeed very close, but missed. This very activity in a rapidly expanding art indicates to our mind that if all the others failed to see what Straub saw, then Straub saw something new; and the fact that he saw it through a maze of inventions and publications which others failed to penetrate argues for invention. Moreover the fact that, since our decision sustaining the patent, Straub's conception has founded a great industry, while the conceptions of others resulted only in desultory and sporadic activities, indicates the great usefulness of Straub's invention and justifies our previous finding.

That the Straub block contains patentably new and useful qualities is clearly evidenced by the unusual demand for it which developed immediately on its appearance in the trade. That the block was new to the building trade, and useful, and has advanced the art substantially, Eibel Co. v. Paper Co., 261 U. S. 45, 63, 43 S. Ct. 322, 67 L. Ed. 523, is proved by the fact that in 1919, the year in which the patent was sustained and the patentee began seriously to exploit it, 18,000 blocks were sold by him. In 1926 his 77 licensees sold 24,533,821 blocks, and within the span of these years 77,268,792 had been made by licensees under a royalty of three-fourths cent per block and taken by the trade. This in masonry space is the equivalent of nearly 1,000,000,000 bricks.

Besides creating a new industry the Straub invention, oddly enough, has given a value to a waste product of other industries. Manufacture of the blocks by licensees at widely separated points for local consumption as against mass production at one point for transportation to distant points of consumption is peculiar to the product and is made necessary by the fact that to make a profit the raw material of cinders must be locally available in sufficient quantities and be either free or very cheap. Licenses granted in different trade areas meet this requirement. So at the beginning the licensees obtained their raw cinders from local furnaces for the hauling, but as the demand grew the otherwise free material acquired a money value and now sells at about $15 a carload. In one instance where before the patent it cost the operators of certain furnaces from $7,000 to $9,000 a year to remove cinders, they now have an annual profit of $15,000 from the sale of cinders for use in the Straub block.

After a careful study of a record which, judged from its size and character, must very nearly cover the art, we are constrained again to sustain the validity of the claims of the patent in suit.

The infringements charged are in no way related. They will therefore be considered separately.

#### Crozier-Straub, Inc., et al. v. Thomas Graham et al., No. 3776.

There are two claimed infringements by Graham: One charged by the bill and occurring before suit, when he started in business in 1924; the other when, after suit and in claimed violation of a preliminary restraining order, he made blocks of another composition in 1925. Contempt proceedings that followed were dismissed, and Graham has since practiced the process and made the product which is the principal one in question. We shall call them the 1924 block and the 1925 block.

##### 1924 Block.

According to Graham's testimony this block had the following composition:

15 shovels cinders (original mass, machine crushed).

5 shovels sand.

1 shovel lime.

calcium chloride (small quantity).

5 shovels cement.

Straub went into Graham's plant before suit and saw his men making mixes preparatory to molding. These he testified were composed of:

24 shovels cinders (original mass, machine crushed).

3 quarts sand.

2 quarts lime.

1 bucket cement.

Of course, if we believe Straub, the addition of 3 quarts of sand to 24 shovels of cinders was a weak effort to escape infringement. If we take Graham's proportions, the presence of sand and the quantity used might or might not be a device by which to avoid infringement. The testimony of neither witness was contradicted. The use of calcium chloride was merely to facilitate drying. In any event the addition of lime and calcium chloride would not change the characteristics or alter the functions of the Straub block and therefore would not avoid infringement. We cannot measure infringement by comparing shovelfuls of sand with shovelfuls of cinders; we can determine infringement only by finding whether the quantity of sand used destroyed the characteristics of the cinder block of the patent where cinders and ash alone are used as an aggregate. Even accepting the mix in the proportions testified to by Graham, we find that the resultant block retained the characteristics of the cinder block of the patent in suit and constituted infringement.

### 1925 Block.

According to Graham the 1925 block was made as follows:

12 shovels cinders (original mass, machine crushed).
6 shovels slag grit (ground slag).
2 shovels sand.
1 shovel lime.
5 shovels cement.
calcium chloride (small quantity).

Later Graham omitted the one shovel of lime and substituted therefor 2 shovels of sand, making the aggregate 12 shovels of cinders and 10 shovels of slag grit and sand. Here again it is impossible to measure infringement merely by comparing the proportion of sand and grit with the proportion of cinders. The stone aggregate of 10 shovels may or may not destroy the characteristics which alone the 12 shovels of original mass, machine crushed cinders, would give the block of the patent in suit. Therefore we shall decide this question, not by shovelfuls, but by results, which in the block of 1925 show unquestioned changes in characteristics from those of the block of the patent. This Graham block is heavier than the Straub block because of the greater proportion of grit in the form of slag and sand. It is for the same reason stronger in its resistence to compression strains; it is more solid, that is, less porous, because of fewer cells; for the same reason it is less soundproof; nails cannot be driven into it.

The plaintiffs, on whom rests the burden of establishing the tort of infringement, though proving a cinder content, have failed to prove that the Graham block of 1925 has the characteristics of the Straub block. Therefore we hold that the Graham block of that period does not infringe. It should be noted very clearly that this decision is rested on that block just as it was exhibited to us and on the testimony as to its composition, characteristics and functions. In the course of the argument the court, conscious that their minds were leaning to a finding of non-infringement by the 1925 block because of differences in characteristics between it and Straub's, but remembering that Graham once thought he had escaped infringement by using a little sand with Straub's cinder aggregate, and being concerned that their judgment, if for Graham, should be restricted to blocks precisely like the one in evidence and should not be used as a screen behind which to change proportions by increasing cinders and decreasing grit and thereby making avail of cinder characteristics of the block of the invention, asked counsel for Graham whether, if the patent should be found valid but not infringed by his block of 1925, Graham would be content as a condition to such a decree in his favor to be enjoined not thereafter to change the proportions of cinders and grit from those in the block in evidence. To this question, curiously enough, Graham, speaking through his counsel, replied that he would not be content with such a decree. Although this attitude of Graham is disturbing, it cannot turn us from a proper decision on the evidence presently before us. This decision we make by holding that the Graham block of 1925 did not infringe. It may be pertinent to say, however, that the court will not regard complacently any diminution that Graham may hereafter make in the proportion of grit and sand content to the cinder content in the manufacture of blocks where such change should be found to infringe.

### Crozier-Straub, Inc., et al. v. Jacob Melmod et al., No. 3777.

According to Straub's testimony he saw mixes made at Melmod's plant which consisted of a pile of mechanically crushed cinders and one bag of cement with the customary water. Melmod testified that his mixes consisted of lime, calcium chloride, cinders, water and cement, but that at first he added "a

326

little bit of sand." Being more specific, he stated the proportions as follows:

18 scoops cinders (original mass, machine crushed).
1 scoop lime.
5 scoops (one bag) cement.
1 bucket calcium chloride.

Manifestly the addition of lime and of calcium chloride to facilitate drying did not destroy the characteristics or hinder the functions of the block of the composition of the patent in suit. Melmod infringed.

Crozier-Straub, Inc., et al. v. Robert G. Downer, No. 3778.

Downer blocks have been made under several formulæ, one:

18 shovels cinders (original mass, shovel crushed).
6 shovels sand.
5 shovels (one bag) cement.

Later he increased the sand content to 8 or 10 shovels, if the cinders ran very coarse. Moreover, he did not machine grind his cinders; he broke them by a shovel, the pieces that were too large being cast aside.

Another formula was:

25 parts cinders (original mass, shovel crushed).
10 parts sand.
5 parts cement.

Still another:

18 parts cinders (original mass, shovel crushed).
5 parts sand or gravel.
5 parts cement.

The resultant blocks were, according to the defendants in error, "on the border line of nailability." We think they were over the line; they were clearly nailable. Also they were heavier than the Straub block and somewhat stronger because, containing sand, they were denser. The Downer blocks were trial approaches to the danger line of infringement. While the proportions of sand in the several formulæ were large and indeed substantial enough to make one believe at first that the resultant blocks were not Straub blocks, yet we find they retained, not in perfection yet in fact, the characteristics and functions of the block of the patent in suit. Therefore we find they infringed.

The decrees of the District Court are reversed, with direction that the three bills be reinstated, and the cases proceed in a manner not inconsistent with this opinion.