## CROZIER–STRAUB, Inc. v. MARYLAND CONCRETE CORPORATION.

### No. 1566.

District Court, D. Maryland.
March 12, 1930.

Marbury, Gosnell & Williams, of Baltimore, Md., Charles L. Pierce, of Philadelphia, Pa., and Charles M. Clarke, of Pittsburgh, Pa., for plaintiff.

Young, Crothers & Settle, of Baltimore, Md., for defendant.

SOPER, District Judge.

The bill of complaint in this case was filed by Crozier-Straub, Inc., owner of United States patent, No. 1,212,840, to Francis J. Straub, and Cinder Block Corporation, exclusive licensee under that patent in Baltimore, against the Maryland Concrete Corporation. The bill charges infringement of the patent, and prays for an injunction and an accounting for damages and profits.

The patent relates to a building block and a method of making the same. The object of the patent, the method pursued, and the qualities of the resulting product are described in the following quotation from the patent specification:

"My invention has in view to provide a building block, brick, or slab composed of a mixture of lump and fine cinder, cement and water, without the use of sand or any other material, and consists in the process of manufacturing the same and the resulting product.

"Ordinarily, concrete mixtures of various kinds utilize sand, crushed stone, or other mineral as a body or filler, either wholly or partly in combination with the required proportion of cement as a binder. In carrying out my invention, I use coal cinders or ashes which are first crushed or ground to a consistency composed of pieces not larger than say three-quarters inch and retaining all of the smaller sizes and the dust and fine ashes, which are otherwise ordinarily thrown away as refuse. This crushed material, after reducing the larger lumps and clinkers, which are more or less porous, provides the coarser pieces or lumps of a maximum size sufficiently small to enable the cement to penetrate through their pores and interstices and bind the entire mass in a homogeneous body.

"The ground mixture also retains all of the usual accompanying adhering portions of

the cinders in the resulting product and it is essential that the original mass of cinders and ashes as it comes from the furnace grate bars, or other source remains in the resulting mixture without separation or change of proportions.

"A suitable proportion of cement, say one-sixth, is added with the necessary water, and the batch is then very thoroughly mixed. The retained finer cinder and ashes, combined with the cement, thoroughly mixes with the larger pieces, providing a uniform quality of all sizes throughout, and measured portions of the resulting mass are molded into block, brick or slab-form and then dried.

"Owing to the absence of sand or other similar mineral material, the resulting blocks, etc. harden by natural evaporation and at the same time, retain the porous light qualities of the original cinders to a very considerable degree, while at the same time having the necessary strength and resistance to crushing strains."

The specification also states and the proof shows that by the elimination of sand or crushed stone as a body or filler for the concrete, and the substitution of the cinder aggregate, the product has a certain porosity by reason of which the building blocks are fireproof, moisture proof, and sound proof to a high degree. The finished material has less density and weight than the ordinary concrete block, and, in addition, has the unusual characteristic of nailability, that is to say, it can be driven into by a nail or easily cut without impairing its strength so that it may be readily used for the attachment of wood trim, etc., without the necessity of supplemental nailing strips.

Claim 1 of the patent, which forms a sufficient basis for a discussion of the issues raised in this case, is as follows:

"1. The herein described process of making building blocks and the like consisting in crushing or grinding an original mass of coal cinder and ashes without separation, mixing the entire mass of coarse and fine material with a suitable proportion of cement and water, and molding and drying the same in block form."

The patented process has been the subject of great interest to the building trades, and has been involved in considerable litigation. Its validity has been sustained in two decisions of the Circuit Court of Appeals of the Third Circuit, Straub v. Campbell, 259 F. 570, and Crozier-Straub, Inc. v. Graham, 28 F.(2d) 321. See, also, the decision of the District Court for the Eastern District of Pennsylvania, Crozier-Straub, Inc., v. Reiter, 34 F.(2d) 577. These decisions are accepted by the court in the pending suit as establishing the validity of the patent. A considerable number of prior patents and publications, together with some testimony as to prior use, have been put in evidence, but nearly all of this subject-matter (including the Ransome patents hereinafter described) was fully considered by the Circuit Court of Appeals in the Graham Case, and the few additional citations throw no new light on the subject. The situation therefore falls within the rule well stated in American Cone & Wafer Co. v. Denaro (C. C. A.) 297 F. 913, 917:

"The rule of comity is not one of courtesy only, but has been established for the very practical and useful purpose of producing uniformity of decisions, where the records are substantially the same, as is the case here, and should not be departed from, except for sound and convincing reasons."

See, also, Imperial Bottle Cap Co. v. Crown Cork & Seal Co. (C. C. A.) 139 F. 312.

Speaking of the Straub product in the Graham Case, the Circuit Court of Appeals said (28 F.(2d) 321):

"The building block of the patent is a simple one. It is of familiar shape and is intended generally for uses long known. Invention in the product, if any, resides in its constitutents which are, cement and water (both old) and 'a mixture of coarse and fine coal cinder and ashes, retaining all of the original mass.' Invention in the process, if any, must be found in the manner of making blocks of this constituency; that is, 'in crushing and grinding an original mass of coal cinder and ashes without separation, mixing the entire mass of coarse and fine material with a suitable proportion of cement and water, and molding and drying the same in block form.'

"We recognized in the Campbell Case that the use of cinders in groutings, foundations, walks, roads, and other structures was old and we learned from the few patents in the record that ashes and cinders, screened or washed or otherwise prepared and selected and proportioned with other ingredients had appeared in the patent art, but (again from the record) we found that no one before Straub had, when making building blocks, conceived the idea of taking the whole ash product—cinders and ash alike, half burned

and wholly burned, lumps and dust—in fact, the entire run of the grate, using the whole waste product in its raw state and rolling or grinding the whole mass. This process appealed to us as new and we also thought the product of the process, namely, the cinder block, was new, not in its form but in its make-up and characteristics. While in form it is that of the ordinary building block it has marked features, some improvements on old blocks, others wholly new."

After examining the prior art in detail, the court reiterated its conclusion of validity first announced in the Campbell Case and referred especially to the commercial success of the process as strong evidence that Straub had disclosed a useful invention. The court said at page 324 of 28 F.(2d):

"Moreover the fact that, since our decision sustaining the patent, Straub's conception has founded a great industry, while the conceptions of others resulted only in desultory and sporadic activities, indicates the great usefulness of Straub's invention and justifies our previous finding.

"That the Straub block contains patentably new and useful qualities is clearly evidenced by the unusual demand for it which developed immediately on its appearance in the trade. That the block was new to the building trade, and useful, and has advanced the art substantially * * * is proved by the fact that in 1919, the year in which the patent was sustained and the patentee began seriously to exploit it, 18,000 blocks were sold by him. In 1926 his 77 licensees sold 24,533,821 blocks, and within the span of these years 77,268,792 had been made by licensees under a royalty of three-fourths cent per block and taken by the trade. This in masonry space is the equivalent of nearly 1,000,000,000 bricks.

"Besides creating a new industry the Straub invention, oddly enough, has given a value to a waste product of other industries.

"Manufacture of the blocks by licensees at widely separated points for local consumption as against mass production at one point for transportation to distant points of consumption is peculiar to the product and is made necessary by the fact that to make a profit the raw material of cinders must be locally available in sufficient quantities and be either free or very cheap. Licenses granted in different trade areas meet this requirement. So at the beginning the licensees obtained their raw cinders from local furnaces for the hauling, but as the demand grew the otherwise free material acquired a money value and now sells at about $15 a carload. In one instance where before the patent it cost the operators of certain furnaces from $7,000 to $9,000 a year to remove cinders, they now have an annual profit of $15,000 from the sale of cinders for use in the Straub block."

The evidence in the pending case demonstrates that, since the Graham Case was decided, the widespread use of concrete cinder blocks has been sustained, and the amount produced each year has steadily increased. Thus it appears that by the end of the year 1928, 90,000,000 blocks on the basis of a standard unit measuring 8"x8"x16" had been manufactured.

Although the defendant denies the correctness of the decisions which uphold the validity of the patent and submits the same evidence on that point in this court as was used in the earlier cases, the defense most earnestly urged is that the patent is not infringed by the operations which take place in the defendant's plant. That establishment is engaged in the manufacture of cinder blocks. All of the cinders used are furnished by the Bethlehem Steel Company which produces them at its boiler houses in the consumption of a fuel, consisting of coke braize or fine coke. The furnaces of the steel company are equipped with chain grates which move mechanically so as to convey the fuel from the front of the furnace to the back, consuming it as it travels. By the time the fuel has reached the back of the furnace, it has been consumed and the cinders drop into the pit below. A forced draft under pressure is used. The largest size of the coke braize is about $\frac{5}{8}$ of an inch; however, when the material has been burned, some of the cinders are 6 inches in length. The hot cinders are taken from the furnaces, loaded into small cars, transported to a cinder pit partially filled with water wherein they are deposited and quenched. The pit is of the approximate dimensions of 10' wide by 20' long by 20' deep. When the cinders are ready for shipment, they are taken out of the pit by a clam-shell bucket operated by an overhead crane and placed in railroad cars.

At the defendant's factory the cinders are unloaded from the car by buckets on a chain elevator by which they are deposited upon a belt conveyor, and are thence carried to a screen. At the entrance to the screen there is a magnetic pulley for the extraction of foreign matter, such as nails, pieces of the chain grate, and other articles which form no part of the cinder material. After the cinders

pass over the pulley, they are deposited into an inclined rotating screen with half inch openings. Below the screen is a bin which receives the finer material, comprising everything up to the half inch size. The larger material, after leaving the screen, passes through crushing rollers whereby everything larger than ¾ of an inch is reduced to that size or smaller, and thence to a second bin. During the passage of the coarser material through the screen and the crushers, a certain amount of fine material is necessarily formed and deposited in the coarse bin. In passing, it may be noted that when the plant was inspected by the court, counsel, and experts during the trial of the case, it was observed that a considerable quantity of the fine cinders intended for the fine bin had accumulated in one corner of the coarse bin due to the fact that one of the boards in the structure was out of place. It is not unlikely that this mixture was due to accident, but, as it was clearly visible, it seemed to indicate that the complete separation of the fine cinders from the coarse in the defendant's process is not a matter of prime importance.

Beneath the bins is placed a movable measuring hopper. Equal quantities of coarse and fine cinders are deposited in it, and it is then brought over to the mixing machine and discharged. At this point in the operation the cinders are recombined and very thoroughly mixed together during a five-minute period, for the purpose, according to the defendant's testimony, of drying them. Thereafter water and cement are added together with a small proportion of weak hydrochloric acid and the mixing is continued for an additional period of five minutes. The wet aggregate is then discharged in limited quantities into the mold box wherein the block is tamped under the gravitating action of several vertically moving tamps. The block is then stripped from the form and transferred to a steam curing inclosure in which it remains for twenty-four hours at a temperature of approximately 100° Fahrenheit. Then the blocks are stored in the open air for further drying for a period, which, under the usual provisions of the building codes, may not be less than twenty-eight days.

The defendant contends that, in a number of details, there are substantial differences between the operation thus outlined and that disclosed in the patent in suit. Particular reference is made to the file wrapper of the patent in order to show that before issue the patentee definitely restricted the scope of the patent to such extent that it does not cover the field of the defendant's activities. The Patent Office first rejected the claims of the patent upon the patent to Ransome, No. 322,-599 of 1885, and the subsequent patent to the same inventor, No. 516,112 of 1894. The first of these patents covered a process for the manufacture of building blocks out of the waste products of combustion. The inventor pointed out that these waste products, as gathered from many sources, nearly always include imperfectly consumed particles of fuel of which the proportion is sometimes so considerable that the product will constitute what is generally termed cinders, as distinguished from ashes. In carrying out the process, the waste matter was first passed through screens to separate the ashes from the cinders. The inventor suggested that the separated cinders might be reduced to a state of ash for the purpose of utilizing the whole of the waste matter; but he declared that if it is desired to secure special fireproof and durable qualities in the finished brick, the materials should be free from cinders; while if these special qualities are not essential, a proportion of cinders may be allowed to remain in the material. The process also included a washing out of the soluble salts in the material, the addition of a proportion of lime or cement as a binding agent, and then burning the mixture. Sufficient water was then added to bring the mixture to a proper consistency for molding, and the material was then molded into shape under pressure.

In the second patent, which is described as an improvement on the first, the inventor claimed a process for making artificial blocks from city refuse (including waste combustible matter, such as cinders from furnaces, coal slack, sawdust, straw, manure, etc.), which process consisted in dividing the material into two portions, in one of which limestone was added, burning both portions separately, subsequent grinding of the limed portion to fine powder, crushing the other portion into coarse grains, mixing the two portions together with water and molding them into the required shape. It was directed in the specification that the limed clinkers should be ground very fine and that the unlimed should be broken or granulated, and that the two grindings should be mixed together in such a way as to furnish the proper portion of fine material for mixing with the coarser ground clinker. The inventor contemplated the use of a wide variety of waste combustible material, the division thereof into two portions, the addition of limestone to one, the burning of both portions separately,

130

the subsequent grinding of the two portions as described, and then a mixture in certain proportions to be determined.

█ When the patent in suit was rejected on these citations, the inventor pointed out that his invention involves an essentially different procedure in that the coal ashes or cinders are taken from the furnace in an original mass which is neither divided nor treated separately, but is maintained together and crushed to reduce the larger pieces to smaller size, so that, except for the crushing, all the material is retained as it was in the original mixture. The addition of the cement is made without separation of the mass, and there is no resort to a remixing or a supplementing of one kind of material with another. It was pointed out that separation and subsequent remixing seem to destroy completely or materially interfere with the process or the obtaining of satisfactory results, since they destroy the close intimate association of the parts in their natural relationship.

In order to make the invention more clear, the patentee amended his specification by adding the following phrase: "It is essential that the original mass of cinders and ashes as it comes from the furnace, grate bars or other source, remains in the resulting mixture without separation or change of proportions." Claim 1 of the patent was amended by inserting therein the words "original mass." Claim 2 was amended by adding the phrase, "ashes retaining all of the original mass." Subsequently a third claim, as it now appears, was inserted wherein the same idea involved in the preceding amendments is emphasized. It is settled that a patentee is bound by the concessions and restrictions made in the Patent Office. Weber Electric Co. v. Freeman Electric Co., 256 U. S. 668, 677, 41 S. Ct. 600, 65 L. Ed. 1162. He may not, by construction or by resort to the doctrine of equivalents, give to his claims the larger scope they might have had without the amendment.

█ The defendant insists that the separation of the cinders into two portions, according to size, by means of the screen, and the subsequent mingling of equal portions of the fine and coarse material from the two bins, distinguishes its process from that of the patent whose specification expressly requires that all of the smaller sizes and the dust and fine ashes shall be used so that the original mass of cinders and ashes, as it comes from the grate, "remains in the resulting mixture without separation or change of proportion."

It seems clear, however, that the mere separation and recombination of the cinders would not of itself constitute a great or substantial departure from the patented process. See the like conclusion of the District Court in the Graham Case when considering an instance of prior use, 22 F.(2d) 310, 313. If the entire mass of material substantially as it comes from the furnace enters into the mixture from which the blocks are formed, infringement would not be avoided by the mere device of separating the refuse into two portions, according to size, grinding the coarser material, so that the pieces would not exceed the three-quarter inch size mentioned in the specification, and immediately thereafter, recombining the two parts. It would still be true that the original mass would remain in the resulting mixture without real separation or change of proportion, and enter into the finished product.

This procedure was followed in substance in the defendant's factory. It is true that there is evidence tending to show that, during the period of two years prior to the hearing, there were five or six occasions when the plant was shut down because there was a shortage of material in the fine or coarse bin which had to be replenished by subsequent deliveries of cinders. But this testimony seems to emphasize rather than to disprove that the original material was used in its natural proportions. The defendant's plant is of considerable size and capacity. The cinder aggregate which is deposited in the mixing machine is taken in equal proportions from the coarse and the fine bin. If there was sufficient material of each kind on hand, except in the exceptional instances referred to, it would seem to follow that the division of the material made by the screen resulted in the separation into equal parts of the mass which were afterwards combined in the same proportions. It should be also borne in mind that the character of material and the screening and crushing operations were such that no precise line of separation could in any case be drawn. Each of the bins of necessity contained materials of all sizes, although in one of them the coarser material was present in larger proportions and in slightly larger sizes. The accidental mixing of one sort of material with the other which occurred, apparently without material injury, on the day when the plant was inspected, makes it the more clear that there is no genuine distinction in the respect under consideration between the defendant's operation and that disclosed in the patent. The

screen performed no useful function except to separate out the finer cinders which it was not necessary to crush.

An analysis or test of the material as it was found in the railroad car on the defendant's siding and in the defendant's bins was made by plaintiff's expert by passing the material through a succession of screens diminishing in the sizes of their respective openings. The samples from the two bins were combined in equal parts before the test so as to reproduce the defendant's mixture. The cinders from the car of course contained pieces of larger size than defendant's aggregate which had gone through the screen and crusher in the plant; but, when these larger pieces were laid aside, there was a striking similarity in each of the graded sizes in the two sets of samples. It may be noted that there was more fine dust in the crushed aggregate than in the original cinders, doubtless by reason of the crushing operation.

A comparative sieve analysis was also made of samples taken from the coarse and fine bins in order to ascertain what was accomplished by the screening or separation of the larger particles to be crushed. The result was that coarse and fine materials were found in both samples, and, although the original mass had been divided into two parts, neither part represented a clearly defined class. In short, the test indicates that if the bins in the defendant's plant had been filled from the original mass after crushing, but without screening, there would have been substantially the same material introduced into the mixing machine as defendant obtains in its manner of operation. It is noteworthy that the thorough mixing of the cinder aggregate in the mixing machine before the addition of cement and water tends to alter the sizes of the cinders introduced, because it reduces the size of the larger particles and creates additional fines. The final mixture would doubtless be substantially the same, whether the separation of the material into separate bins took place or not.

The defendant points out other matters of minor importance which do not seem to the court to constitute a substantial differentiation from the process of the patent, whether they be considered separately or in combination. It is said that the defendant does not follow the patent because it does not use coal cinders and ashes, but merely the refuse material which remains when coke braize is used as fuel in the furnace. The word "coal" in the claims, however, is ob-

viously used, as will appear from the file wrapper of the patent, to exclude cinders and ashes from wood. Coke itself is a solid product of the carbonization of coal, and coke braize consists of the fine particles of coke. In short, the defendant uses cinders and ashes which are formed by the burning of a substance which itself results from the partial burning of coal. These are clearly the equivalent of cinders and ashes from coal. It is also suggested that some chemical change in the iron compounds of the cinder material takes place at the plant of the Bethlehem Steel Company when the hot cinders are cast into a pit partly filled with water; that some of the finer particles go to the bottom of the pit and are not removed by the scoop in the same proportions as they exist in the original refuse when the shipment is made; that some of the finer materials are lost during transportation in the cars and while the cars are on the siding at the defendant's plant through the water impregnated with cinder dust which escapes; that the magnet installed above the screen to eliminate metallic objects extraneous to the cinders also lifts out certain iron compounds which are present in the cinders in an amount which cannot be determined from the evidence; and that during the removal of the cinders from the car into the plant, and during its progress in the screening and crushing operations, certain of the finer materials are lost in the shape of dust and float away through the air. But it is obvious that even if full force and effect be given to the alterations of the original mass which these various incidents entail, nevertheless these is no substantial difference between the refuse created at the steel company's furnace and that which finally is deposited in the molds in the defendant's plant. If any other conclusion were reached, it would seem to follow that no one could be certain to infringe the patent unless he placed his manufacturing apparatus beneath a boiler room and got his cinders hot from the grate.

The defendant also contends that it must be adjudged innocent of infringement because it holds a license and operates under the Cordery patent, No. 1,218,239, of 1917. This patent covers a brick composition product consisting of 3 parts of cinders, 3 parts of clinkers, 1 part colored earth, and one part cement, mixed together and treated with acidulated water. The defendant does not literally comply with all the provisions of this process, because it omits the use of colored earth. It does, however, divide its aggre-

gate into separate parts and does use hydrochloric acid. Considerable testimony was taken as to the quantity of acid employed. The defendant asserted that it used one part of acid to 30 parts of water which would seem to indicate a 1 per cent. solution, since commercial hydrochloric acid has a strength of approximately 35 per cent. The strength of the acid was much less when actually introduced into the mixing machine, because of the large quantities of water added at that time. The testimony gave little indication as to what part was played or what improvement was made by the addition of acid. Discussion on the subject is of no value, since it may be admitted for the purpose of this case that the acid treatment improved the quality of the product. But, even if this be true, infringement nevertheless exists, for, as has been shown, the defendant made use in other respects of the invention in suit. One cannot adopt an invention and escape infringement thereof by adding an improvement to it. Rowley Co. v. Columbus Co. (C. C. A.) 220 F. 127, 137; Herman v. Youngstown Car Mfg. Co. (C. C. A.) 191 F. 579; Premier Register Table Co. v. West (D. C.) 21 F. (2d) 766; Bassick Mfg. Co. v. Ready Co. (D. C.) 22 F.(2d) 331, 339.

A similar comment may be made with regard to another feature of the defendant's operation, namely, the curing process during which the block, after molding, is placed in a steam room for a period of twenty-four hours. The testimony shows that in a concrete mixture of this sort the finished product may not be used until the expiration of a certain period during which dehydration takes place. Water is lost or evaporated, and the block is hardened. The period must be prolonged under most of the building codes for twenty-eight days before the block is ready for use. For some reason not clearly explained, the drying operation is hastened and the block more quickly attains the necessary strength by the application of heat of approximately 100° in a room filled with steam. The defendant raises the point because the specification of the Straub patent declares that after the manufacturing operation has been completed the resulting blocks harden by natural evaporation. The defendant contends that it does not depend on this expedient. The evidence, however, is to the contrary. Notwithstanding the steaming process, the blocks are later exposed to the open air in the defendant's yard for a period of twenty-eight days, during which there seems to be no question that the process of natural evaporation takes places and the block gradually reaches the stage of perfection. In short, the usual hardening operation is merely improved and accelerated by the preliminary application of steam.

A decree adjudging the patent valid and infringed will be signed.