SAMSON GRANITE CO., Inc., v. CROZIER STRAUB, Inc., et al.

No. 4318.

Circuit Court of Appeals, Third Circuit.
June 18, 1930.

Charles J. Holland, of New York City, for appellant.

Thomas G. Haight, of Jersey City, N. J., Charles M. Clarke, of Pittsburgh, Pa., and Charles L. Pierce, of Philadelphia, Pa., for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge.

This appeal is from an interlocutory decree finding infringement and granting an injunction. The case is one of more than forty infringement suits that have followed in the train of our decisions in Straub v. Campbell

(C. C. A.) 259 F. 570, 571, and Crozier-Straub, Inc. v. Graham (C. C. A.) 28 F. (2d) 321, 322, sustaining Letters Patent No. 1,212,840 issued to Straub in 1917 for a building block and method of making the same. In those cases we stated the art, quoted the specification, discussed the invention, set forth the claims and construed them at length. In this case where the single issue is infringement we shall rely upon those decisions as the basis of our judgment, adding nothing to and taking nothing from the construction of the claims there made. Moreover, we shall refer to and regard the opinions in those cases as a preface to the opinion in this case, repeating only enough to make a start.

There are three claims in the patent—all in issue. The broad product claim is for "A building block composed of a mixture of coarse and fine coal cinder and ashes, retaining all the original mass, cement and water." The process claim is for the manner of making a product of this composition, that is, "in crushing and grinding an original mass of coal cinder and ashes without separation, mixing the entire mass of coarse and fine material with a suitable proportion of cement and water, and molding and drying the same in block form."

Straub was the first in the art to make such disclosures. Therefore we found them novel. Construing the invention, we said in the Campbell Case:

"The gist of his invention, for such we think it is, was in taking ordinary furnace ashes and using the whole of that product, without sifting or selection. He found that, by taking the whole of the ashes—clinkers, fine dust, and all—and grinding the entire product and mixing it with cement and water, he was able to produce a new and useful article in the building art. * * * While even screened ashes had been used in building blocks, no one before Straub conceived the novel idea of taking the whole ash product—clinkers and ash alike, half burned and wholly burned, lumps and dust—in fact, the entire run of the grate, and using the whole waste product in its raw state, rolling or grinding the whole mass."

This we held constituted patentable novelty.

In the Graham Case we summarized the characteristics of the block previously stated in the Campbell Case by saying:

"All blocks are more or less soundproof but Straub's is more soundproof than others with hard aggregates, doubtless for the reason that instead of being a solid mass as when made of sand or stone aggregate it is porous, containing myriads of cells; it permits nails to be driven into it without breaking and firmly holds the nails in place; it is lighter in weight and cheaper to make than any block brought to our attention; though porous and light, it is strong; and, though strong, can be broken on nearly straight lines."

It is, in addition, fireproof and is a heat, cold and damp resistant beyond blocks made of hard aggregate. Still more, it will, because of its rough surface, receive and hold without woodwork plaster and stucco of all kinds. Straub was first to produce such a block. The manufacture and sale of more than 100,000,000 blocks of this kind by seventy licensees are evidence of its utility, to say nothing of the tribute paid by infringers throughout the country. We found patentable utility and held all claims valid.

As the sole question is one of infringement within the scope of the claims as defined by their terms and construed by this court, we shall, in order to show precisely to what our decision is directed, state the case as it was made by the parties at the hearing.

The plaintiffs charged the defendant with two distinct infringing practices extending through two sharply marked periods; the first being from June, 1927, until October, 1928; the second from October or November, 1928, until (at least) January 4, 1929, the date of suit. The ending of the first period and the beginning of the second with their accompanying infringing practices, if not occasioned by, were coincidental with the decision of this court in Crozier-Straub, Inc. v. Graham, 28 F.(2d) 322, rendered on September 26, 1928. In order to prove the first infringing practice during the first period the plaintiffs, on August 23, 1928, purchased one of the defendant's cinder blocks and later offered it in evidence as Plaintiffs' Exhibit No. 1. They produced witnesses who testified to its composition—qualitative rather than quantitative—showing that with water evaporated it contained only two elements, cement and cinders, the particles in the latter being from fine to coarse with normal intermediates, indicating, though of course not proving conclusively, the "original mass" aggregate of the patent. They then proved that the block possessed all the characteristics of the Straub block claimed by the patent and found by this court. That was the plaintiffs' prima facie case on the first infringement.

In the defendant's case, one of its officials testified that in its blocks of the first period it used four elements instead of the three of the patent, namely; cinders, cement, water

and muriatic acid. Why muriatic acid, the witness could not state, though we gather from the opinion in Crozier-Straub, Inc. v. Maryland Concrete Corporation (D. C.) 39 F.(2d) 126, where with some variation the same elements were employed, it was used for drying purposes. As this acid element though functioning perhaps in curing the block played no part in making it, we shall, as did the judge in that case, put it outside of our consideration. About two of the remaining elements, cement and water, there is of course no question. Nor is there, we apprehend, any question about the last element, cinders, for the witness admitted that the blocks manufactured by the defendant during the first period were made "of all different sizes of cinders and ashes," "using all the mass" without "any screening." On these proofs and admissions there can be no doubt that the defendant's practice during the first period constituted infringement.

In order to prove the alleged infringing practice during the second period, the plaintiffs, on December 5, 1928, purchased one of the defendant's cinder blocks made during that period. On its being received in evidence as Plaintiffs' Exhibit No. 11, witnesses testified from its structure that it contained ashes and cinders, fine to coarse, and possessed all the characteristics of the block of the patent. In addition they put in evidence a copy of the Northern Valley Tribune of October 23, 1928, containing an advertisement of the defendant's new block under the name "Cinderblox," a trade-name simulating and combining the words of the plaintiffs' name "Cinder Blox." The defendant by its advertisement described the characteristics of its block as follows: "Fireproof—nailability —high crushing strength—heat, cold, damp resistant—light in weight—ideal bond for all kinds of stucco." That was the plaintiffs' prima facie case on the second infringement.

The defendant, when it came to its defense, proved that during October, 1928, it reorganized the machinery of its factory and developed a new process, whether to evade or avoid the Straub patent is of little moment for, after all, the thing to be determined is what was done and whether it was within or outside the patent.

The defendant put in evidence a diagram and photographs of the plant which, supported by testimony, show that by its process it screened the ashes and cinders and molded the resultant product into blocks. On this it confidently relies for avoiding both the process and product claims of the patent. There is the question. The answer depends upon how the defendant did it and what, precisely, did it accomplish.

The process may best be shown by describing the organism through which it was practiced. Cinders and ashes when gathered from the point of origin were trucked up a ramp and dumped into a hopper in their crude state or "original mass." They were then hoisted from the hopper by a bucket conveyor to a rotary screen, open at both ends and having two parts. One, where the ashes and cinders entered, had mesh of $\frac{3}{16}''$ through which, it was testified, all particles smaller than the mesh sifted into a chute whence they were carried away and never used again. The other part of the screen had mesh of $\frac{3}{4}''$ through which particles greater in size than $\frac{3}{16}''$ and less than $\frac{3}{4}''$ —the latter the precise maximum of particles of the patent—fell into a hopper, whence they were carried by a conveyor to a storage bin in final shape for molding into blocks. Particles larger than $\frac{3}{4}''$ were carried out the farther end of the duplex screen and dropped into a crusher, set at about $\frac{1}{2}''$, from which the product, when crushed, was conveyed back to the first hopper and, with other crude material being added all the time, was carried through the cycle as before.

This was more the theory than the actual practice of the process for notwithstanding the defendant's positive testimony that all "fines"—ashes and particles of cinder less than $\frac{3}{16}''$—passed through the first screen leaving only particles of intermediate and large sizes and thus separating the "original mass" and obtaining a graded resultant product, the defendant itself proved that this was not—and could not be—entirely true. The defendant's witness admitted on cross-examination that some fines remained. This was due to several things: One, that a $\frac{3}{16}''$ mesh screen stretched in circular form as against being stretched flat will make an opening a little less than $\frac{3}{16}''$; another, that the cinders as they came from the furnace pits, being always damp, moist, or wet—4% to 20% moisture—as a result of fire extinguishing practices everywhere pursued and not thereafter being dried, a portion of the fines clung to and passed on with the larger particles; and still another, and perhaps the most important, the rotary non-vibrating screen inevitably clogged or went "blind" with wet cinders, requiring it to be struck or jarred by the operator every few minutes. Thus the question how much of the fine material remained became acute. While the defendant did not prove what proportion of the total fines content was screened out, it did, at one-

time, give evidence that the proportion of fines to large particles was as 8% or 10% is to 90% or 92%. There was still open the question of the quantum of fines that remained.

The plaintiffs, when they came to their rebuttal, met this question by producing a witness who had been a licensee of the plaintiffs and later had surrendered his license and tried to make a block with the Straub characteristics by using crushed slag for 25% of the aggregate and the larger particles of screened cinders for the balance, discarding the fines. After several years of failure along these lines he reacquired a license and resumed making Straub blocks. His testimony is illuminating. He testified that in his endeavor to avoid the Straub patent he first used a rotary screen with a 3/8" mesh—twice the size of the defendant's mesh—and that, operating on wet cinders, it was a complete failure as the meshes clogged every three or four minutes and required an extra man constantly to beat them open. Even then his 3/8" screen operated at only about 50% efficiency, that is, he got out about half of the fines, and said that for a rotary screen to operate at even 75% efficiency the cinders must be dry. Drying cost money. He knew of no such practice anywhere. Finding the rotary screen "absolutely useless," he installed a vibrating screen of the same 3/8" mesh, set at an angle. That did very little better. He then returned to the patent.

Still the question—what quantity of fines remained after screening—was unanswered. A witness for the defendant, however, assisted in answering this question by finally stating the quantity of fines extracted from the original mass. He said that in a truck load of ashes and cinders there were from 3 to 12 wheelbarrow loads of ash and fine stuff screened out. Reckoning, on his figures, a truck load at 270 cubic feet and a wheelbarrow load at 2 cubic feet, the plaintiffs estimated that the elimination was from 2.2% to 8.8%, or an average of not over 5.5% of the original mass in volume. Elsewhere there is testimony that on an experimental run of cinders from the Ruther plant, the source of the defendant's supply, completely dried, 58.2% of the total mass passed through a 1/4" screen and 24.9% through a 1/8" screen, from which the plaintiffs argue that—still speaking of perfectly dry cinders—upwards of 40% of the mass would pass through a 3/16" screen. The plaintiffs thereupon make the deduction that the unscreened fines remaining in the defendant's process and later used amounted to about 34.5% of the total

cinders, or original mass, and argue therefrom that the remaining mass contained all the potential elements of the original. In view of the variable factor of mass contents and the uncertain factor of damp, moist and wet cinders, we think this is a too refined calculation in a rough art to be accepted as a mathematical demonstration of the quantity of fines retained and used. Yet it has an approximation value, for it accords with the evidence which proves, and we so find, that much of the fines was retained, and enough was retained to produce a block with the precise characteristics and functions of the block of the patent, as to which the defendant did not deny its advertisement but on cross-examination admitted, one by one, the presence of these characteristics.

At the trial much discussion revolved around the words "original mass" as used in the patent claims and as construed in the Campbell and Graham Cases, particularly by the expressions "the whole waste product," "the whole ash product," "the entire ash body," "the whole of the ashes," and "the entire run of the grate." Indubitably, Straub's contribution was the use of all the products of combustion ranging from coarse to fine. The defendant claims that Straub accepted the patent with these distinct limitations and is bound by them. In consequence, it maintains that anyone who in making blocks uses anything less than the cinder and ash mass as lifted from the pit is outside the patent, that it used less and therefore it did not infringe. The syllogism is, we think, imperfect, not because, as the defendant intimates, the plaintiffs are seeking to broaden the claims under the doctrine of equivalents, for there is no question of equivalents here, but because under the patent law the claims extend to and cover a method or product which though not precisely is yet substantially that of the patent. It has been proved beyond question that crude mass as it is taken at different times from the same grate or different grates varies in ash, cinder and clinker content. Yet from masses with these variables the block of the patent can be made. This is because the functional elements of the rough mass are not closely apportioned and nicely balanced. There is some play, some latitude in the proportions from fine to coarse within which the product can be made. While the patent undoubtedly calls for and is limited to the original mass, that mass in the patent sense is not destroyed when some clinkers, too hard to crush, are thrown out or when some fines are screened out if what remains possesses all the elements of mass

formation—fines, intermediates and coarse—and possesses them in volume and proportion which enables them to combine and function just as though nothing had been removed. Crozier-Straub, Inc. v. Downer (C. C. A.) 28 F.(2d) 321, 326; Crozier-Straub, Inc. v. Reiter (D. C.) 34 F.(2d) 577. In other words, if after removal of a part of the mass the remainder functions substantially as the original mass would function before any of it. was withdrawn, the composition is substantially that of the patent. The mere discarding of some of the mass without changing the functional alignment of its elements will not avoid the patent. There is in this case no evidence which proves that the withdrawal of fines from the original mass either changed the function of what was left or produced a different product. It may be —though it has not yet developed in any of the cases coming to our attention—that something other than the actual or substantial original mass of ashes and cinders will produce a block with the characteristics of the invention. That situation will be met when it arises. It is, however, not here, for we find that the defendant's manufacturing product, though the resultant of a screening operation, was substantially and functionally the "mass" of the patent. Therefore, holding that both process and product claims were infringed, the decree is affirmed.