## PERMUTIT CO. v. PAIGE & JONES CHEMICAL CO., Inc.

(District Court, S. D. New York. July 27, 1923.)

Patents ⊙⇒328—1,195,923, for water softening apparatus, held valid and infringed.

   The Gans patent, No. 1,195,923, for a water softening apparatus which differed from the earlier experiments in that the filter was separated from a zeolithic bed leaving the latter free so that the particles might "boil" and freely assort themselves during "back-washing," remedying several serious defects in operating previous similar devices, *held* not anticipated by prior publications, and hence valid and infringed.

In Equity. Suit by the Permutit Company against the Paige & Jones Chemical Company. Decree for complainant.

James Q. Rice and M. C. Massie, both of New York City, for plaintiff.

Hanz V. Briesen, of New York City, for defendant.

LEARNED HAND, District Judge. This patent having passed the Circuit Court of Appeals for this circuit (Permutit Co. v. Harvey Laundry Co., 279 Fed. 713), it is unnecessary and would indeed be improper for me to reconsider the references which were then before the court. Since the infringement of claim 1, at least, cannot be successfully denied, the case comes down to a consideration of the new references brought forward on this hearing. Before taking them up, however, I may say a word respecting the argument that the plaintiff in the former suit misled the court in maintaining that before the patent in suit, no machine had ever been devised which could produce "zero water."

The evidence on which this assertion rests is some language in an article which appeared in a German publication "Technische Rundschau" on January 27, 1909, certain representations made by the German company regarding the "Aquaril" filter in 1908, and Gans's exploitation of what was probably the patented invention in the spring of 1909. It may be true that the "Aquaril" filter, which was considered by the Circuit Court of Appeals and found not to be an anticipation, "performed excellent services." It may equally be true that a boiler fed by the machine described in the Rundschau was "perfect in every respect" at the end of three months, and that Gans was making purifiers after this patent in the spring of 1909. If so, it may be incorrect to say that no machine has ever produced "zero water" before that here patented. But I do not see that it is a matter of critical consequence, and, if it were, the evidence is rather meager. I may at once throw out Gans's French exploitation of the present machine. It would be relevant for any purpose in this case, only if a foreign use were a valid anticipation. As to the other two instances, while a machine in which the top of the zeoliths is held down by a screen may at times work satisfactorily and produce "zero water," it is not in the long run what the art wants, and it will not hold its own with the patent in suit. Granting all that the defendant claims, the result, as I view it, is no more than that the claims should not be entitled to so broad a scope as they would otherwise enjoy.

Even after Leister's patent which showed a downward flow of water, the distinctive feature of the invention, on which it may safely rest, is the free surface of the zeoliths themselves, something clearly indicated in the designs of the patent and indeed presupposed in a stirring device such as is described. Claims 1 and 5, moreover, are distinguished by the absence of a sand filter which again involves the free surface of the zeoliths. This feature was not at first understood. The earlier machines, e. g., Feldhoff's, or better Gans's first patent, and (as I shall show) probably Leister's as well, contained the zeoliths by a top screen. But the results were not satisfactory in the respects discussed in Judge Manton's opinion. It is essential for good practice that the particles shall freely assort themselves during "back-washing" and in a measure too during both purifying and regeneration, so that the smaller shall be in the top layers and the coarser below. This cannot occur if they are held tight, and there result several serious defects in operation, e. g. "channeling," air pockets, and difficulty in cleaning the zeoliths from slime or dirt.

To ascertain from experience the need of a free surface to the bed was a genuine invention, even if everything else in the machine had been disclosed before. A filter is concededly necessary. The earlier experiments naturally put it close to the bed itself. It took observation and analysis to learn what was the cause of the bad results and to find the remedy. I am therefore by no means disposed to say that there was no invention in separating the filter from the bed and leaving the latter free, so that the particles might "boil." It is necessary, however, to examine the references with a view to ascertaining whether any of them show this feature.

First, I shall consider Gans's own paper, "Ueber die Technische Bedeutung der Permutite," published in April, 1909. This was an article in a scientific paper, "Chemische Industrie," dealing with the chemical action of zeoliths. At the conclusion Gans was describing the process of softening water. It is probable, perhaps certain, that he had in mind the apparatus manufactured by the Riedel Company at about that time; but the question is not what he meant but what he said, and about that there is a clear difference of honest opinion. The controversy centers on a single passage which is for the most part undisputed and reads as follows:

"The layer of permutit lies on sand fine on top and coarser as you go to the bottom."

Then come the disputed words. The plaintiff's translation is freely this:

"It is best to shut this off by a sand filter set over the top of the layer of permutit about one-third to one-half of a meter thick."

The defendant's translation renders the last clause, "at a height of one-third to one-half of a meter." About this clause the learned doctors disagree, and it seems to me quite enough to say that the disagreement is honest without trying to solve it, which would be quite beyond my powers. To be a valid anticipation greater clarity is necessary, else there is no adequate warrant that the art was enriched. Read in connection with the earlier practice, this article did not to my mind clearly enough show the necessary departure. The law is not friendly to efforts like this to spell out a later invention in the light of what it has itself disclosed.

An earlier reference is Leister's patent of 1908. In this there is very clearly indicated an open space or "cell" between the upper sand filter and the zeolite bed. Therefore the question arises whether the bed is held down on top by a screen, or whether the zeoliths are allowed to boil up during the "back-washing," and to be loosened during filtration or regeneration. The disclosure nowhere says whether the surface is free or not, and the drawings do not seem to intend free surfaces, because the beds end with straight lines. I should, if necessary, hold that there ought to be clearer indication of this feature if the reference were to be an anticipation; but the internal evidence helps towards the conclusion that there were screens intended.

Leister disclosed two forms of his invention, one with a single bed, the other with a double. While, as I have said, it is impossible certainly to ascertain whether he meant to have screens over the zeolitic beds, it is difficult to see how the machine could have been operable without them. The regenerating fluid was not intended to pass through the filter, and probably that was the reason for the space or cell. One thing appears certain, as Waterman says, i. e., that the head of the regenerating fluid was greater than that of the back-wash. If the back-wash was in fact enough to "boil" the zeoliths which is essential to the proper automatic sorting of the particles, then the regenerating fluid would "boil" them more and they would necessarily pass off in substantial quantity through the waste. The cock, 4, in the first form,

and 8 and 9, in the second, are practically at a level with the top of the bed.

Thus, so far as I can see, I have to choose between an apparatus which would lose the zeoliths, and so be inoperable, and one in which there were screens over the beds, as had been the case in Feldhoff's disclosure. It is clear anyway that even if it can be shown at the hearing that the feature, now become so important, was in fact present in Leister's patent, at least the disclosure as it stands will not serve as an anticipation.

The Gebrauchmuster, 313,671, adds nothing to Feldhoff's disclosure; I may pass it. Gebrauchmuster, 341,650 and 342,212, have so little to do with a machine like that in suit that they need little comment. The difficulties of regeneration and back-washing are not considered at all. In 341,650, the zeoliths are held firmly down by the plate, $b$; in 342,212, the diagram apparently indicates that the bed does not reach to the plate, $b$, but that is not specified in the text and no one would suppose that it was required to practice the invention. Nor need the article in the Rundschau be considered at length. The description is certainly not intended to be full enough to follow, and so far as one can gather it contemplates a cover of excelsior laid directly upon the zeoliths. At least, there is no suggestion of any intervening space.

Therefore it does not appear to me that any of the references is sufficient to change the result. Possibly at the hearing some new evidence may be found which will throw upon them a new light, though I confess it seems to me at present rather hard to see how that can be. But that is not the point here. The patent has been adjudicated, the new references as shown do not indicate that if before the court they would have invalidated the patent. Nor does it matter if there had been earlier machines which could produce "zero" water by means of zeoliths. They were not this machine, but earlier efforts not yet perfected. This appears to have been the end, or, as we like to say, the "solution." Those who would use it must pay tribute to the inventor who put the keystone in the arch. The others' forms are open to them.

Nor do I see why an absolute injunction should not go pendente lite. The defendant's business does not consist of the sale of these machines alone. On the contrary, it has so far installed only a few, perhaps only one. This it has done in the face of a decision of the Circuit Court of Appeals which perhaps it wished to test by the new references. Having, as I believe, failed to show any reason to doubt the validity of the patent, there is no just ground for refusing to stop its continued infringement. Nor do I think the pendency of the Detroit suit (Permutit Co. v. Wadhams, 294 Fed. ——) a reason for desisting. When Judge Tuttle decides that case, he will have the advantage of a completer record. Should he finally conclude that the references are valid anticipations, I cannot for a moment suppose that my decision here will unduly influence him to the contrary. That possibility, if it be one, is no reason for denying to the plaintiff the fruits of its victory in this circuit.

The plaintiff may take the usual temporary injunction, conditioned on a bond of $5,000.