LA MAUR, INC., Plaintiff,

v.

L. S. DONALDSON COMPANY and
G. Barr & Company, Defendants.

No. 4-59-Civ-170.

United States District Court
D. Minnesota,
Fourth Division.

Jan. 23, 1961.

772

Harold D. Field, Jr., and Sidney Barrows, Minneapolis, Minn., for plaintiff.

Dean Laurence and Herbert I. Sherman, Washington, D. C., and Edward A. Danforth, Minneapolis, Minn., for defendants.

DEVITT, *Chief Judge.*

This is an action for the infringement of plaintiff's United States Patent No. 2,871,161, and for the misappropriation of a claimed trade secret belonging to plaintiff. Both the patent and the trade secret relate to an aerosol hair spray composed essentially of Freon, alcohol and polyvinylpyrrolidone (PVP).

The Basic Facts

Plaintiff La Maur is a Minnesota corporation engaged in the manufacture of cosmetic products. Its president is M. L. Spiegel, who patented the invention and assigned it to La Maur. Defendant L. S. Donaldson Company is a Minnesota corporation which operates a department store. Donaldson is charged with patent infringement, but is not named in the trade secret cause of action. Defendant G. Barr & Company (Barr) is an Illinois corporation engaged in the loading (i. e. manufacturing) of aerosol products for a number of major companies in the cosmetic field, including Max Factor, Toni, Colgate, Hazel Bishop and others. Barr intervened in this case, carried the defense as to both defendants, and is a defendant as to both the patent count and the trade secret count.

Polyvinylpyrrolidone, commonly abbreviated PVP, is a member of a special class of chemicals called polymers. Although PVP has been known since it was synthesized in Germany in the 1930's, the only commercial application of the material prior to Spiegel's claimed invention was in the pharmaceutical field, especially as a blood plasma extender. Aerosol hair sprays had been manufactured and were in use for some time prior to Spiegel's claimed invention, but they were made with shellac-type materials which are not polymers and have no chemical similarity to PVP.

Spiegel is a chemist and, learning through trade bulletins of the manufacture of PVP by the General Aniline & Film Corp. (GAF) in the summer of 1951, started experiments with it for use in the cosmetic field. He dissolved PVP in alcohol and sent the solution to

Barr in Chicago for loading with Freon in pressurized containers for the purpose of determining the compatibility of the ingredients. They were compatible, and the resulting hair spray turned out to be superior to any then known.

Early in 1952 plaintiff made arrangements to have its new hair spray manufactured by Barr. Plaintiff furnished the necessary PVP to Barr, identified only by the code name "resin LM." In March of 1952 plaintiff received his first shipments of aerosol PVP hair spray and has since been selling it under the trade name "Style", with marked success.

At about the same time, it is claimed by plaintiff, Barr made unsuccessful efforts to identify plaintiff's resin LM, both by attempted chemical analysis in its laboratory and by seeking the technical assistance of the Catalin Corporation of America and the American Cyanamid Company. The resin LM could not be identified. Plaintiff claims that in June of 1952 Barr identified resin LM when it succeeded in surreptitiously uncovering a GAF label which plaintiff had concealed with dark ink and another label on a container shipped to Barr. The GAF label revealed that resin LM was PVP. It is further claimed that Barr immediately began experimenting with PVP hair spray for its own benefit, and took some of plaintiff's production stock of resin LM for that purpose.

On July 31, 1952 Spiegel filed his patent application. In November, 1952 plaintiff shifted his loading business from Barr to another company. Plaintiff maintains that during all of this time he kept the identity of his resin LM secret and that Barr knew that it was to be kept secret.

Meanwhile, the plaintiff had disclosed his secret to GAF in confidence. In November of 1952 GAF, allegedly taking advantage of the confidence, started to promote the use of PVP hair sprays throughout the industry, principally through one Edwin P. Hay, a salesman. Hay then told Barr about PVP hair spray.

It does not appear from the evidence that Barr at any time disclosed his previously acquired knowledge as to the real nature of resin LM. In December, 1952, GAF, through salesman Hay, and Barr, started the promotion of aerosol PVP hair spray using Spiegel's formula. GAF intended to sell the PVP, it being the only manufacturer of it, and Barr intended to get the loading business, it being the principal company engaged in that business. Subsequently, most of the major cosmetic companies put out PVP hair spray using, it is claimed, the Spiegel formula.

Between 1953 and 1956 the aerosol hair spray industry expanded tremendously, the majority of products being of the PVP type.

On March 27, 1953, one Martinelli, a GAF chemist, filed a patent application for PVP hair spray. On February 21, 1957 the Patent Office formally declared an interference proceeding between the Spiegel application owned by the plaintiff and the Martinelli application owned by GAF. This interference proceeding, which was actually a contest between La Maur and GAF, eventually terminated on January 27, 1959 in favor of Spiegel and the patent in suit was issued to plaintiff.

Subsequently plaintiff sought to issue licenses under the patent in suit to the entire trade. Some companies, e. g. Breck, took licenses, but most of the trade refused. The defendant Barr indemnified his customers against liability for infringement of the patent. By this time the aerosol hair spray business was running at a volume of approximately a million dollars a year, largely PVP sprays, which, it is claimed, infringe on plaintiff's patent.

In their answer to the patent infringement cause of action, the defendants claim principally that the patent is invalid because it lacks novelty and was anticipated by the prior art, and that the claimed patent does not comply with the requirements of 35 U.S.C.A. § 103 in that the claimed invention was one which

would have been obvious, at the time the invention was allegedly made, to a person having skill in the art. They argue that plaintiff's claims are not stated in the full, clear, concise, and exact terms required by 35 U.S.C.A. § 112.

The defendants also claim that even assuming that the patent is valid and complies with the requirements of 35 U.S.C.A. §§ 102 and 103, and with § 112, there has been no infringement because the hair spray loaded by Barr does not fall within any of the 9 claims of plaintiff's invention, and that it is a different product from Spiegel's, composed of copolymers of vinylpyrrolidone with vinyl acetate rather than of homopolymers of vinylpyrrolidone, as is Spiegel's.

As to the trade secret count, the defendant denies that La Maur had any trade secret, and asserts that it did nothing wrong and infringed none of plaintiff's rights in determining the true nature of plaintiff's resin LM or in experimenting with it or with PVP. At all events, it claims that if it did learn a trade secret, it did not violate a confidence, either by using it or telling others about it. Barr claims that the secret, if any there be, was publicized to the trade by GAF through salesman Hay, and then became public knowledge.

## The Chemistry

A consideration of the issue presented requires some explanation of the principles of polymer chemistry which are involved. The plaintiff's principal witness in this regard was Dr. Herman Mark, Director of the Polymer Research Institute at the Polytechnic Institute of Brooklyn. It appears that Dr. Mark is one of the world's foremost authorities in the field of polymer chemistry. He testified at great length about the principles involved and their application to the present case. Two other distinguished polymer chemists, Dr. Courtland Agre, a Professor from Augsburg College in Minneapolis (called by defendants) and Dr. Edward J. Meehan, a Professor from the University of Minnesota

(called by the plaintiff) also testified on this subject. With the exception of the semantic issue hereinafter referred to, there appears to be no substantial disagreement between these three polymer chemists with respect to the following general aspects of the field.

Polymer chemistry covers a field where very large molecules have molecular weights which may be thousands of times greater than the molecular weights of other substances. A polymer molecule may be likened to a string of beads, with each individual bead being called a monomer or monomeric unit. If the beads are all alike, the material is called a homopolymer; if there are two different kinds of beads (illustrated by beads of two different colors), the material is called a copolymer. In what appears to be the orthodox definition, the word polymer embraces both homopolymers and copolymers, but it also appears that the word polymer in context is sometimes used in the more restrictive sense of homopolymer.

In the type of copolymers with which we are here concerned, the two different color beads (or monomeric units) occur in more or less random order within any given molecule, and copolymers can be prepared with any desired proportions of the respective constituents.

It also appears that polymer molecules, unlike molecules of other substances, are not all alike. Thus, with respect to molecular weight, for example, a polymer consists of a number of chain molecules of varying length. The molecular weight of a polymer, therefore, is expressed as an average. Because polymer molecules are so large, polymers have been found to possess physical strength which makes them useful as films and coatings, and also as fibers. Nylon, for example, is a polymer; so is synthetic rubber.

In this case, we are concerned with vinyl polymers. In addition to polyvinylpyrrolidone, other vinyl polymers to which frequent reference was made in the testimony, are polyvinyl acetate, polyvinyl chloride and polyvinyl alcohol.

The function of the vinyl portion in each case is to provide the backbone or string which holds the beads together, whereas the properties of the polymer are contributed by the pyrrolidone or the acetate or the chloride or the alcohol portion attached to the string which is the vinyl group.

If we start out with a homopolymer of vinyl pyrrolidone, for example (illustrated by all white beads), we would have one set of properties, namely those imparted to the polymer solely by the pyrrolidone. By the same token, if we take a homopolymer of vinyl acetate (illustrated by all red beads) we would have those properties which are imparted to the polymer solely by the acetate. If we then make up a series of copolymers of vinyl pyrrolidone and vinyl acetate (i. e. strings of white beads and red beads together), having progressively larger and larger proportions of red beads, the resulting copolymers would exhibit a gradual change of characteristics from those of the homopolymer of vinyl pyrrolidone to those of the homopolymer of vinyl acetate. The reason for this is that each bead, or monomeric unit, brings with it its own characteristic properties, so that the more red beads that are incorporated with the white beads, the greater will be the evidence of red behavior, and the less will be the evidence of white bead behavior.

Although the different types of monomeric units comprising a copolymer are actually chemically bound together within each molecule of the copolymer, a copolymer actually appears to be something in between an ordinary chemical compound and a mixture. In the case of a mixture the proportions of the ingredients may be varied in any manner, and the properties of a particular mixture depend upon the proportions of the various constituents which are used. Plaintiff cites the example of a cup of coffee to which more and more cream is gradually added. In this respect, therefore, plaintiff says a copolymer is comparable with a mixture. On the other hand, there is no chemical transformation involved in preparing a mixture, whereas there is in the preparation of a copolymer. In the ordinary chemical compound, however, there is usually a definite and discreet change from one compound to another, and the constituents of the ordinary compound can be put together only in a limited number of clearly defined proportions. But a copolymer is not limited by this characteristic of other compounds, and may be made in any desired proportions, with the properties changing gradually as the proportion of one type of monomeric unit is increased while that of the other type is decreased.

In polymer chemistry the respective monomeric substituents of each copolymer tend to contribute their own characteristic properties. Although the properties of a particular copolymer cannot be predicted with mathematical certainty, the trend which the properties will follow, as the proportions of the respective substituents are changed, has long been predictable under the fundamental laws of polymer chemistry.

The fact that a copolymer is thus in effect something in between a chemical composition and a mixture is responsible for another important distinction between polymers and other chemicals. Ordinarily, gradual modification or dilution may only be brought about by a physical mixture. Thus, coffee may be diluted or modified by adding water or cream, and the modification or dilution may be carried out to any desired degree. In the case of copolymers, however, not only is physical dilution or modification possible (e. g. when it is desired to make a polymer film more flexible, this may be accomplished by physically mixing in what is known as a plasticizer), but in addition, a polymer may be modified or diluted chemically by incorporating within the polymer molecule itself appropriately selected monomeric units to impart the desired characteristics. Thus, a polymer may either be externally plasticized, by a physical mixture, or internally plasticized by copolymerization.

Both are well known alternative techniques for making a polymer more flexible.

### The Infringement Issue

With this background we may first consider the specific infringement issue and, later, the validity issue.

While it is theoretically possible that vinyl pyrrolidone might be copolymerized with a large number of other monomers, it appears that the only commercially available copolymers of vinyl pyrrolidone are those composed of vinyl pyrrolidone and vinyl acetate, in various proportions. Of these, the only one which the defendants have used or sold for hair sprays since the issuance of the patent is a product sold by GAF under the designation PVP/VA E–735, which is a copolymer consisting of 70% vinyl pyrrolidone by weight and 30% vinyl acetate by weight. The only other commercial product with which we are here concerned is the homopolymer of vinyl pyrrolidone, which is sold by GAF under the name PVP NP K–30. The NP indicates "non-pharmaceutical" grade, and the "K–30" indicates the average molecular weight, which is similar to the average molecular weight of the PVP/VA E–735.

The product with which plaintiff has been making its "Style" hair spray since 1952 is the homopolymer PVP NP K–30. Barr likewise made aerosol hair sprays with PVP NP K–30 for a number of years. When the patent in suit issued on January 27, 1959, Barr had on hand some PVP NP K–30, and proceeded (with full knowledge of the patent, and after being advised by its counsel that the patent covered PVP NP K–30) to clean up its inventory by manufacturing and selling about 40,000–50,000 cans of infringing hair spray. Barr concedes infringement to this extent, but asserts that those 40,000–50,000 cans were negligible in comparison with the approximately 30,-000,000 cans of aerosol hair spray manufactured by Barr annually. Barr also asserts that it has stopped using PVP NP K–30 completely since manufacturing these 40,000–50,000 cans.

Since the issuance of the patent in suit, however, Barr has also manufactured and sold millions of cans of aerosol hair spray containing PVP/VA E–735, and the sole infringement issue in the case, therefore, is whether these hair sprays made with PVP/VA E–735 infringed the patent.

Claim 8 of plaintiff's patent, which is typical, reads as follows:

"A sprayable hair-preparation, comprising a substantially water-free alcoholic solution of polyvinyl-pyrrolidone and Freon."

Similar language appears in the first 7 claims, although each is more specific in emphasizing one aspect or another of the invention. As to the first 8 claims, therefore, the question is whether PVP/VA E–735 constitutes, or is equivalent to, or is a mere dilution of "polyvinylpyrrolidone" as that term is used in the patent. Claim 9, instead of using the word "polyvinylpyrrolidone", refers to "a product essentially consisting of polymerized units of the" vinyl pyrrolidone monomer. Plaintiff's experts say that this language in Claim 9 simply makes explicit what is already implicit in the term "polyvinylpyrrolidone" as used in the other claims.

Plaintiff contends that PVP/VA E–735 is in substance and in reality, for hair spray purposes, the equivalent of PVP NP K–30, which is conceded to infringe. In support of its contention, plaintiff relies in the first instance on testimony by Dr. Mark. To prepare for his testimony, Dr. Mark studied the language of the patent in suit and all of the pertinent literature, and carried out a series of experiments to support his conclusions drawn from the basic laws of polymer chemistry. Dr. Mark's experiments included not only the PVP NP K–30 and the PVP/VA E–735, but also copolymers of vinyl pyrrolidone and vinyl acetate containing respectively 90% vinyl pyrrolidone, 80% vinyl pyrrolidone, 60% vinyl pyrrolidone, 50%

vinyl pyrrolidone, and 30% vinyl pyrrolidone.

His measurements show that (1) while the addition of more and more vinyl acetate reduces the affinity or degree of bonding of the polymer film to the hair, and likewise reduces the amount of moisture which the film can pick up from the atmosphere, particularly at higher humidities, in both respects, the degree of change from the characteristics of the homopolymer PVP NP K–30 to those of the PVP/VA E–735 is not substantial; (2) the addition of more and more vinyl acetate does not bring about any sudden change in the character of the polymer, but only gradual changes; (3) none of the essential properties of polyvinylpyrrolidone as described in the patent in suit are lost or significantly interfered with by the insertion of 30% vinyl acetate; and (4) whatever modification occurs by reason of the incorporation of 30% vinyl acetate with the vinyl pyrrolidone in the accused PVP/VA E–735 is very similar to a modification suggested in the patent itself.

Thus, the patentee, in the patent, suggests that the film deposited by his hair spray may be made somewhat more flexible by the addition of a plasticizer called diethyl phthalate. This material is not only known to be a plasticizer, but is also known to be a water repellent one which tends to reduce the hygroscopicity of the polymer film, i. e. the amount of moisture which the plasticized film will pick up from the atmosphere. Charts were submitted by Dr. Mark showing that the addition, by physical mixture, of larger and larger quantities of diethyl phthalate brings about a gradual reducduction in the hygroscopicity of PVP NP K–30 films. This is the same effect which is achieved by internal modification when the vinyl pyrrolidone monomers are copolymerized with larger and larger amounts of vinyl acetate, instead of being polymerized alone, to form the homopolymer.

Witness Mark also illustrated the fact that both the PVP NP K–30 with diethyl phthalate and the PVP/VA E–735 are more flexible than the unplasticized PVP NP K–30. He also measured the hygroscopicity of films sprayed from various commercial hair sprays, including plaintiff's product "Style", the product of plaintiff's licensee Breck, and three of the products manufactured by Barr. The measurements show that the differences among them were insubstantial, even at high humidities.

In Dr. Mark's opinion, PVP/VA E–735 is equivalent to PVP NP K–30 for aerosol hair spray purposes. He explained the reason for this equivalence to be that the essential properties of the polymer in both cases are imparted by the vinyl pyrrolidone monomer. He said the vinyl acetate was essentially a dilutent.

Practical evidence of equivalency was presented which showed that during 1957, GAF's facilities for the production of the vinyl pyrrolidone monomer were unable to keep up with the demand, and it then had available only limited quantities of PVP NP K–30 and limited quantities of PVP/VA E–735. At least one of the major cosmetic companies used these two products interchangeably, from batch to batch, in the same hair spray under the same label.

Defendants, for their part, do not appear to seriously dispute the equivalency of PVP/VA E–735 and PVP NP K–30 for hair spray purposes. The most that can be said from the testimony of Barr's chief chemist on this subject is that the PVP/VA E–735 may be a slight improvement over the PVP NP K–30. The defendants offered no testimony to contradict plaintiff's showing that PVP/VA E–735 and PVP NP K–30 are essentially interchangeable, and work in the same way to achieve the same results by reason of the same essential ingredient, namely the vinyl pyrrolidone.

In applying the claims under this state of facts, the Court is faced at the outset with the question of semantics. Dr. Mark, Dr. Agre and Dr. Meehan all testified on the semantics problems. All agreed that polymer names, such as

polyvinylpyrrolidone, are used under some circumstances to embrace not only homopolymers, but also a spectrum of copolymers, and under other circumstances are used to refer only to homopolymers. To Dr. Mark and Dr. Meehan, the extent to which the term "polyvinylpyrrolidone" is generic depends upon the context and upon the realities of each particular situation. Thus, they say, any chemist with some basic knowledge of polymers would know after reading the patent, that not only the homopolymer of vinyl pyrrolidone, but also any one of a number of copolymers would have essentially the same characteristics for the purposes of the patent, provided only that the proportion of the added monomer is not made too great in any particular case. Thus, to the extent that the added monomer is merely a dilutent or a minor modifier, not changing any of the properties essential so far as the patent is concerned, Dr. Mark and Dr. Meehan would give the term "polyvinylpyrrolidone" used in the patent a generic meaning, covering a class of homopolymers and copolymers of differing molecular weights and differing compositions so long as the vinyl pyrrolidone remains the basic operative ingredient, and is present in a sufficiently high proportion to provide the characteristics required by the patent.

Dr. Agre, on the other hand, while agreeing that dozens of different copolymers of vinyl pyrrolidone, in appropriate proportions, would be virtually indistinguishable from the homopolymer, insists that since the vinyl pyrrolidone monomer is the only one mentioned in the patent, the term "polyvinylpyrrolidone" should be interpreted to mean the homopolymer.

The Court, notwithstanding the extensive testimony by the polymer chemists on this semantic question, does not propose to decide the case on a purely semantic level, and, indeed finds no need to do so because the Court is of the view, and finds, that the product PVP/VA E-735 is polyvinylpyrrolidone in reality, regardless of whether or not it is polyvinylpyrrolidone as a matter of semantics. This is a case where substance and plain reality must govern, and not mere verbalism. Pertinently the Supreme Court said in Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 607, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 1101–1102, that:

" * * * courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage— the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form."

Plaintiff also urges that, for aerosol hair spray purposes, PVP/VA E-735 is in effect simply a diluted form of PVP NP K-30, and that even if the semantic question be resolved to adopt the narrower view, there is infringement without resort to the doctrine of equivalents. It is, of course, the law that one cannot escape the claims of a patent by diluting its ingredients or inserting additives or modifiers which do not change the essence of the invention. Crozier-Straub, Inc. v. Graham, 3 Cir., 1928, 28 F.2d 321, 325–326, certiorari denied 279 U.S. 840, 49 S.Ct. 253, 73 L.Ed. 987; Marks v. Polaroid Corporation, D.C.D.Mass.1955, 129 F.Supp. 243, 267, affirmed 1 Cir., 1956, 237 F.2d 428, certiorari denied 352

U.S. 1005, 77 S.Ct. 564, 1 L.Ed.2d 550. Chief Judge Sweeney said in the Polaroid case:

"* * * the addition of other substances to those claimed in the patent does not avoid infringement where such additional substances are not shown to radically change the composition of the patent, I. F. Laucks, Inc. v. Kaseno Products Co., D.C., 59 F.2d 811; Aluminum Co. of America v. Thompson Products, D.C., 25 F.Supp. 175; Union Carbide & Carbon Corp. v. Graver Tank & Mfg. Co., D.C., 106 F.Supp. 389."

The Polaroid case is particularly in point here, because in that case the Court relied on the testimony of Dr. Herman Mark to find that the accused polymer film was an infringement.

In Crozier-Straub, supra, for example, the patent in suit covered cinder blocks, consisting of various ingredients including coal, cinder and ashes. The alleged infringer added varying quantities of sand at different times. The greater the amount of sand, the less soundproof the blocks became, and the more difficult it became to drive nails into the blocks. These were two of the essential features of the blocks. The Court said at page 325 of 28 F.2d:

"We cannot measure infringement by comparing shovelfuls of sand with shovelfuls of cinders; we can determine infringement only by finding whether the quantity of sand used destroyed the characteristics of the cinder block of the patent where cinder and ash alone are used as an aggregate."

The Court then considered the characteristics of the allegedly infringing blocks, and found infringement where the essence of the original characteristics were still retained by the accused blocks. See also Haynes Stellite Co. v. Chesterfield, 6 Cir., 1927, 22 F.2d 635, 638, where the Court said:

"It is enough to say that we are fairly well satisfied, from the expert evidence and the practical tests made, that plaintiff is right, and that the carbon is a mere addition (even if sometimes an improvement) to the patented combination, the employment of which by defendant does not avoid infringement. The same conclusion must be reached as to the use of the fraction of nickel which the defendant substitutes for some of the cobalt (14 per cent. of the whole, one-third of the cobalt-nickel total). Nickel and cobalt are not, precisely speaking, equivalents in making up the patented combination, but they have some of the same qualities; and the fraction of nickel substituted by defendant we are satisfied does not substantially change the character of the cobalt-chromium-tungsten compound."

To the same effect is Sperry Products, Inc. v. Aluminum Co. of America, D.C. N.D.Ohio, E.D.1959, 171 F.Supp. 901, 922.

The foregoing cases, of course, relate to additives, diluting materials and modifiers which are added physically rather than chemically. In the present case, the vinyl acetate in PVP/VA E–735 is added chemically. Nevertheless, in the light of the principles of polymer chemistry previously described, the addition of 30% vinyl acetate by copolymerization with vinyl pyrrolidone is, in practical effect, a dilution with an appurtenant minor modification. It is my view that the legal principle which covers dilution and minor modification by physical means should be likewise applied in the polymer field where the dilution and minor modification may be accomplished chemically.

In the present case, defendants do not contest the general rule about additives and modifiers; indeed, they concede that the accused products do not avoid infringement by reason of the fact that they include an assortment of perfumes, brighteners, plasticizers and other additives. That being the case, since the practical effect of the vinyl acetate com-

ponent corresponds generally with the practical effect of the physically added plasticizer mentioned by the patent, the applicability of the foregoing rule to PVP/VA E–735 seems appropriate.

With respect to the issue of infringement, the burden of proof is on plaintiff. The Court finds that plaintiff has met this burden, and finds on the basis of all the evidence in the case substantial infringement by both defendants of all nine claims of the patent in suit.

### The Validity Issue

Spiegel filed his patent application on July 31, 1952. The Patent Office issued him a patent on January 27, 1959, after the application had gone through the usual procedures of investigation and examination in the Patent Office, and the somewhat inordinate procedure of standing up under an interference proceeding.

The patent is presumed to be valid, and the burden of establishing its invalidity is upon the defendant. 35 U.S.C.A. § 282. It has been held that the new 1952 Patent Act reinvigorated this statutory presumption of validity. Georgia Pacific Corp. v. United States Plywood Corp., 2 Cir., 1958, 258 F.2d 124, 132, certiorari denied 1958, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112. There is no question that a patentee is entitled to the benefit of the statutory presumptions, and this rule has been responsible for sustaining many patents, e. g., Willis v. Town, 8 Cir., 1950, 182 F.2d 892.

This presumption of validity is entitled to especially great weight where, as in this case, the prior art relied upon by the claimed infringer was carefully considered by the Patent Office. Anderson Co. v. Sears, Roebuck & Co., 7 Cir., 1959, 265 F.2d 755; University of Illinois Foundation v. Block Drug Co., 7 Cir., 1957, 241 F.2d 6, certiorari denied 1957, 354 U.S. 922, 77 S.Ct. 1382, 1 L.Ed. 2d 1437; Cold Metal Process Co. v. Republic Steel Corp., 6 Cir., 1956, 233 F.2d 828, certiorari denied 1956, 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86; Babson Bros. Co. v. Perfection Mfg. Corp., D.C. D.Minn.1949, 86 F.Supp. 754.

It has been held that every reasonable doubt should be resolved against the person attacking the validity of a patent. Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983, 985, 987. The Eighth Circuit Court of Appeals and other appeals courts have reaffirmed this rule. Ezee Stone Cutter Mfg. Co. v. Southwest Indus. Prod., 8 Cir., 1958, 262 F.2d 183; National Latex Products Co. v. Sun Rubber Co., 6 Cir., 1959, 274 F.2d 224, certiorari denied 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022; Cameron Iron Works, Inc. v. Stekoll, 5 Cir., 1957, 242 F.2d 17.

One Juettner, a Minneapolis patent lawyer and former examiner in the Patent Office, testified that only about 1 per cent of the patents issued by the Patent Office are subjected to an adversary proceeding with regard to validity. It appears that in the interference proceeding here, most, if not all, of the pertinent prior art was advanced and was fully considered by the Patent Office, making, it follows, an especially strong case for the application of the presumption of validity.

The law provides that whoever invents any new and useful composition of matter, or any new and useful improvement thereof, may obtain a patent, 35 U.S.C.A. § 101, subject to certain restrictions and limitations set out in 35 U.S.C.A. §§ 102 and 103. Section 103 provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

In essence this section requires that the invention may not be patented if the subject matter would have been obvious at the time of the invention to a person having ordinary skill in the art. Although the defendant cites several references which it claims evidence the fact that the subject matter of Spiegel's invention would have been obvious to those skilled in the art in 1951, the Patent Office considered them adverse to the defendant's contention, and an examination of them by the Court does not impress that Spiegel's composition was obvious to those skilled in the art at the time of the claimed invention in 1951.

In essence, Spiegel's invention was of the compatibility of Freon, alcohol and PVP, and of the application of PVP to the hair from a substantially water-free alcohol solution. The compatibility of these substances and their application from a water-free alcohol solution was a new combination and use of substances which, although individually known and appreciated, had never before been combined for use in this fashion. The claimed references do not show otherwise.

The facts here show that Spiegel's composition was not obvious to those skilled in the art. Barr's chemists did extensive research in the field of aerosol hair spray for several years but failed to discover the Spiegel composition. Even after having some of the composition in hand, neither Barr's chemists nor those of the Catalin Corporation of America and the American Cyanamid Company could discover that resin LM was PVP. Martinelli, a research worker for GAF, did research work for many months and did not come up with Spiegel's solution. It is logical to conclude, therefore, that it was not obvious to those skilled in the art that you could take PVP, always thought of before as exclusively a pharmaceutical chemical, and merge it with alcohol and Freon in an aerosol container and spray it on the hair from a water-free solution.

In the case of chemical combinations, a different standard of inventiveness is required than in the case of mechanical inventions. Chief Judge Yankwich of the Southern District of California noted this difference in the case of Everlube Corporation of America v. Electrofilm, Inc., D.C.S.D.Cal.1957, 154 F.Supp. 788, 791, affirmed 9 Cir., 1959, 265 F.2d 495, when he said:

"The Supreme Court recognizes that while in mechanics the uniting of old elements may not satisfy the concept of invention, because the elements may continue, in combination, to perform the same function as before, with no different result, this is not true in chemistry. This for the reason that a chemical element, in a different combination, may achieve a new quality or function.

"This fact, the verity of which is obvious, is of great significance in a case of this character in which it is insisted that all the elements used to achieve the result are well known in chemistry, and that all the patentee did was to urge their use in the particular combination."

It is well established that a chemical combination of known substances is patentable. Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 2 Cir., 1957, 247 F.2d 343, certiorari denied 1958, 355 U.S. 952, 78 S.Ct. 537, 2 L.Ed.2d 529; Colgate-Palmolive Co. v. Carter Products, Inc., 4 Cir., 1956, 230 F.2d 855, certiorari denied 1956, 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59.

There is corroborative evidence of the inventiveness of Spiegel's formula. Aerosol PVP hair sprays have met with marked commercial success. This has long been held to be evidence of invention. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 1944, 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721, 724; Ezee Stone Cutter Mfg. Co. v. Southwest Indus. Prod., 8 Cir., 1958, 262 F.2d 183, 187; Long v. Arkansas Foundry Co., 8 Cir., 1957, 247 F.2d 366, 369; Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 2 Cir., 1957, 247 F.2d 343, 347, 348,

certiorari denied 1958, 355 U.S. 952, 78 S.Ct. 537, 2 L.Ed.2d 529; Colgate-Palmolive Co. v. Carter Products, 4 Cir., 1956, 230 F.2d 855, 862, certiorari denied 1956, 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed. 2d 59.

■ Moreover, Spiegel's invention has been imitated by most of the cosmetic industry, and such imitation is recognized as persuasive corroborative evidence of invention. Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 441, 31 S. Ct. 444, 55 L.Ed. 527, 534; G. H. Packwood Mfg. Co. v. St. Louis Janitor Supply Co., 8 Cir., 1940, 115 F.2d 958, 965; Colgate-Palmolive Co. v. Carter Products, 4 Cir., 1956, 230 F.2d 855, 862, certiorari denied 1956, 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59; Filtex Corp. v. Amen Atiyeh, 9 Cir., 1954, 216 F.2d 443, 445; Ric-Wil Co. v. E. B. Kaiser Co., 7 Cir., 1950, 179 F.2d 401, certiorari denied 1950, 339 U.S. 958, 70 S.Ct. 981, 94 L.Ed. 1369; Trico Products Corp. v. Apco-Mossberg Corp., 1 Cir., 1930, 45 F.2d 594, 598; Kurtz v. Belle Hat Lining Co., 2 Cir., 1922, 280 F. 277, 278.

■ The validity of the patent is strongly supported by Dr. Mark, who concluded that Spiegel's invention was novel and that its novelty consisted principally in the compatibility of Freon, alcohol and PVP. He said this had not been known before, and that it would not have been obvious to a person skilled in the art at the time the invention was made.

Finally, the defendants urge the patent is invalid because the claims do not comply with 35 U.S.C.A. § 112, which provides in part as follows:

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

■ If the term "polyvinylpyrrolidone" is given a more generic meaning, so as literally to include PVP/VA E–735, as plaintiff's experts testified, then defendants' allege that the claims do not particularly point out and distinctly claim the subject matter of the invention. Defendants rely on the rule " * * * that the inventor, when he comes to write his patent, cannot describe his invention in general terms which would include many other chemical substances, some of which would carry out the rule of the patent, but many of which could not be thus employed; that is, the inventor cannot disclose a small number of compounds which will serve as a springboard for claiming an entire class." Hercules Powder Co. v. Rohm & Haas Co., D.C.D.Del.1946, 66 F.Supp. 899, 902.

In particular, defendants rely on Matheson v. Campbell, C.C.S.D.N.Y.1895, 69 F. 597, 602–603, reversed 2 Cir., 1897, 78 F. 910, wherein the Court said:

"I do not understand the law to be so that an inventor can thus speculate on the equivalents of his claimed invention, and thereby oblige the public to resort to experiments in order to determine the scope of the claims of his patent. It is admitted that the general formula covers over 100 different bodies. The patentees declare that they are equivalents * * * In fact, very many of these bodies are not equivalents and will not produce a black color. Whether this statement is true or false, as applied to a particular color, can be ascertained only by experiment. * * * If the experiment succeeds, the patentees claim the body as an equivalent. If it fails, they disclaim it. The law requires that the description in a patent for a chemical discovery should be especially clear and distinct."

See also Corona Cord Tire Company v. Dovan Chemical Corp., 1928, 276 U.S. 358, 385, 48 S.Ct. 380, 72 L.Ed. 610, 620; Armour and Company v. Wilson and Co., D.C.N.D.Ill.E.D.1958, 168 F. Supp. 353, 362, modified 7 Cir., 1960, 274 F.2d 143; General Electric Co. v. Wabash Appliance Corp., 1938, 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402, 1407;

White v. Dunbar, 1886, 119 U.S. 47, 7 S.Ct. 72, 30 L.Ed. 303. The Supreme Court said in Corona Cord Tire Co.:

"Weiss (the patentee) could certainly not claim the entire group of such compounds (disubstituted guanidines). He makes no showing that there is any general quality common to disubstituted guanidines which made them all effective as accelerators. Claims for their exclusive use cannot therefore be sustained." [276 U.S. 358, 48 S.Ct. 388]

The rule of these decisions is well established; the question is whether it is applicable in this case. Plaintiff has not asserted that the term polyvinylpyrrolidone extends to every copolymer of vinyl pyrrolidone. It is the position of plaintiff's experts, particularly Dr. Mark, that the term polyvinylpyrrolidone, in the context of the Spiegel patent, should include homopolymers and those copolymers of vinyl pyrrolidone with other monomers that retain all of the essential attributes which are specifically set forth by the patent and which are contributed by the vinyl pyrrolidone substituent. Some of the possible comonomers, according to Dr. Mark, would bring about a well-known phenomenon, to wit, cross-linking, even with only a small amount of the added monomer. This, however, is a predictable phenomenon, since it depends upon certain known features of the added monomer, and Dr. Mark would not include the cross-linked copolymers even in his most generic definition of polyvinylpyrrolidone in view of the specific properties required by the teaching of the patent.

All other possible comonomers with vinyl pyrrolidone, it appears, would produce copolymers having essentially the characteristics contributed by the vinyl pyrrolidone monomer, and would be substantially interchangeable for the homopolymer for the purpose of the patent, provided only that the proportion of the added monomer, which contributes only a non-essential property, in so far as the patent is concerned, in each case is not too great.

It is this spectrum of copolymers which Dr. Mark would include in his generic definition of polyvinylpyrrolidone, namely, those copolymers which have not yet been so greatly diluted or modified that they lose any of the essential features of polyvinylpyrrolidone required by the patent. On the other hand, Dr. Mark, like the Court in Crozier-Straub, supra, would not include within the term polyvinylpyrrolidone those copolymers which are so greatly modified that one or more of the essential polyvinylpyrrolidone attributes described in the patent is lost.

It is uncontradicted on the record that, with the exception of the monomers which introduce cross-linking, every copolymer of vinyl pyrrolidone with some other monomer would retain the polyvinylpyrrolidone characteristics for the purposes of the patent at certain proportions of the added monomer, but would lose one or more of these characteristics at higher proportions of the added monomer. In each case, the polymer chemist is in a position to make a prediction as to where the boundary area will occur. If the literature is extensive, or if experiments are conducted, the boundary area for a particular copolymer might be narrowed somewhat, but it is inherent in polymer chemistry and in the type of copolymers under discussion, that the transition in properties is gradual as the proportions of the respective monomers are changed. Thus, if we start with black coffee, and add cream, there is necessarily a general boundary area where it is hard to tell whether we have cream-flavored coffee, or coffee-flavored cream.

Under the established laws of polymer chemistry, the same sort of a gray boundary area occurs with respect to the particular polyvinylpyrrolidone properties which are pertinent for the Spiegel invention. Since the various monomers differ in the non-essential properties they contribute, the location

of the boundary area must depend upon the particular monomer involved. Dr. Mark adds that most of the discussion of the possible comonomers is on the academic level since most of the other monomers are laboratory items, if they exist at all. He says that as a practical matter, the most readily available comonomer, having in mind the requirements of the patent, is the vinyl acetate, the one in the accused product.

The basic fallacy in the defendants' position under Section 112, therefore, is that they take the definition accorded to the term polyvinylpyrrolidone by Dr. Mark and Dr. Meehan in the light of the known realities of polymer chemistry, so as to include not only homopolymers, but also essentially equivalent copolymers, and then erroneously attempt to treat this definition as if it included copolymers which are not essentially equivalent. The present case is thus in marked contrast with the Corona Cord Tire Company case, supra, because there is here a distinct showing of general qualities common to the homopolymer and those copolymers which plaintiff asserts are included within the generic term polyvinylpyrrolidone, namely, the qualities imparted by the vinyl pyrrolidone monomer.

Under these circumstances, we do not have a case like the decisions cited by defendants where a generic term is employed which embraces both operative and inoperative substances. Every copolymer which is here included is operative; indeed, some copolymers which are here excluded might also be operative as hair sprays in an appropriate system, since the patent makes requirements as to solubility and compatibility which are necessary for Spiegel's type of hair spray, but do not appear to be essential for a non-Spiegel type of hair spray. The question, therefore, is only whether the patent adequately describes the boundary areas, in the light of the gradual changes which are known to occur.

The rule is well established that where the nature of a particular art or science is such that the claims of a patent cannot be absolutely precise, the law requires only that degree of precision which is reasonable under the circumstances. Minerals Separation v. Hyde, 1916, 242 U.S. 261, 270–271, 37 S.Ct. 82, 61 L.Ed. 286, 293; S. D. Warren Co. v. Nashua Gummed and Coated Paper Co., 1 Cir., 1953, 205 F.2d 602, 605–606. As the Court of Appeals for the First Circuit recognized in Warren:

"Particularity of identification and clarity of statement are relative terms when applied to an invention. Some inventions are capable of description in terms of meticulous accuracy; others are not."

The Court then pointed out that the invention under consideration was in the latter class, because there were a number of different *polymeric* materials which could meet the requirements set forth by the claims. Taking a realistic view of the problem presented to an inventor in describing such an invention in his claims, the Court ruled that, where the specification sufficiently indicates the characteristics of the materials which are to be included, then one skilled in the art could readily apprehend the nature of the invention, and "this is all the law requires."

Similarly, in Minerals Separation v. Hyde, Mr. Justice Clarke, for the United States Supreme Court, declared [242 U.S. 261, 37 S.Ct. 86]:

"Equally untenable is the claim that the patent is invalid for the reason that the evidence shows that when different ores are treated preliminary tests must be made to determine the amount of oil and the extent of agitation necessary in order to obtain the best results. Such variation of treatment must be within the scope of the claims, and the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject matter. The composition of ores varies infinitely, each one presenting its special problem, and it is obviously impossible to specify in a

patent the precise treatment which would be most successful and economical in each case. The process is one for dealing with a large class of substances and the range of treatment within the terms of the claims, while leaving something to the skill of persons applying the invention, is clearly sufficiently definite to guide those skilled in the art to its successful application, as the evidence abundantly shows. This satisfies the law."

See also A. S. Boyle Co. v. Siegel Hardware & Paint Co., D.C.D.Mass.1938, 26 F.Supp. 217, 223, where the Court said:

"The further contention that the claims are invalid because they specify nitrocellulose and there are some kinds of nitrocellulose which cannot be used successfully in the Griffiths composition and hence the claims were too broad and invalid, cannot be sustained. The claims specify nitrocellulose. The patentee stated in his deposition that there were certain types of nitrocelluloses, highly nitrated and explosive, wholly unsuited for use in his composition and that nitrocellulose soluble in ether alcohol is suitable for use. However, in the specification celluloid scrap is the form mentioned to be used and the specification later says that in place of celluloid scrap other forms of nitrocellulose may be used, such as celluloid in the form of sheet or the like. This is the plain guide as to the type of nitrocellulose that is to be used in the composition, namely, that used in the manufacture of celluloid. This variety, it is suggested in the specification, contains the proper degree of nitration. It does not seem that one skilled in the art would have much difficulty about this. He would select a nitrocellulose having the proper degree of nitration. Claims must be read in the light of the disclosure of the specification, not to restrict the invention to the precise structure disclosed, but to grasp the invention in order properly to measure the range of equivalents."

Particularly helpful on the issue of claimed indefiniteness is the decision of the Court of Appeals for the Second Circuit in Georgia-Pacific Corp. v. United States Plywood Corp., 1958, 258 F.2d 124, certiorari denied 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112. In that case, Claim 1, which was the only one properly limited to describe the invention in view of the prior art, was held invalid because of the lack of objective measurements both in the specification and the claims, and the inability of expert witnesses precisely to delimit the scope of the claims. The Court of Appeals reversed, holding Claim 1 valid, and saying at 258 F.2d 136:

"We think that the district court was too rigorous in applying the requirement of precision. This requirement serves two primary purposes: those skilled in the art must be able to understand and apply the teachings of the invention and enterprise and experimentation must not be discouraged by the creation of an area of uncertainty as to the scope of the invention. On the other hand, the policy of the patent statute contemplates granting protection to valid inventions, and this policy would be defeated if protection were to be accorded only to those patents which were capable of precise definition. The judicial function requires a balancing of these competing considerations in the individual case."

After recognizing that the patentee is required to draft his claims as precisely as the subject matter permits, the Court continued at page 136:

"On the other hand, patentable inventions cannot always be described in terms of exact measurements, symbols and formulæ, and the applicant necessarily must use the meager tools provided by language, tools which admittedly lack exactitude and precision. If the claims, read in the light of the specifications, reasonably apprise those skilled in the art

both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more * * * That an area of uncertainty necessarily exists in such a situation cannot be denied, but the existence of an inescapable area of uncertainty is not sufficient justification for denying to the patentee the fruits of his invention."

The Court then continued to consider the uncertainty problem in the light of the doctrine of equivalents, and the following language appears at pages 136–137:

"Indeed, in the administration of the patent statutes uncertainty has been introduced by express judicial creation. It has often been stated that the scope of the patent is limited by the language of the claims. Where, however, an infringer has attempted to appropriate the essence of the invention while remaining outside the language of the claims, courts have not hesitated to apply the doctrine of equivalents, whereby the 'essence' of the invention is protected * * * In such situations the patentee is protected even though he has been more precise than the subject matter of the invention permits or requires. It would be anomalous if this Court were to strike down a patent because the inevitable area of uncertainty was created by the language of the specifications and claims rather than by judicial application of equivalency doctrine."

■ So, in this case, faced with the fact that the defendant has appropriated the essence of the Spiegel invention, the Court will not strike down a patent on a meritorious invention, regardless of whether infringement is found by interpretation of the claims or under the doctrine of equivalents.

■ Here, the specification and claims demark the boundary areas so as to inform someone skilled in the art of the nature of the invention. Dr. Mark testified that he could not provide any words or figures which could any better define the boundaries with respect to molecular composition. This testimony is authoritative and uncontradicted, and the Court is satisfied that the claims are sufficiently definite. To rule otherwise would amount to a holding that in patents involving the use of a polymer, the inventor must either restrict himself so narrowly as to invite imitation or else find his patent invalidated on grounds of indefiniteness.

Furthermore, the claimed indefiniteness is all hypothetical in nature; the only copolymers of vinyl pyrrolidone which are commercially available are those with vinyl acetate. Although there is undoubtedly and inherently some gray area with respect to copolymers of vinyl pyrrolidone and vinyl acetate, PVP/VA E-735 is not in the gray area. This product falls clearly within the claims. Since this is the accused product with which the defendants are infringing, they may not, with propriety, raise objections based upon hypothetical uncertainties. In the language of the Court of Appeals for the Ninth Circuit:

"If it is indefinite in some respects due to the comprehensive character of the invention and of the claims therefor, it is not uncertain in the area of description involved in this action. Any vagueness in these outlying boundaries of the description does not invalidate the patent as to that which is clearly defined." Research Products Co., Ltd. v. Tretolite Co., 9 Cir., 1939, 106 F. 2d 530, 534.

The Court finds that the patent is not invalid for failure to comply with 35 U.S. C.A. § 112.

■ The Court therefore concludes that the discovery was of a new and useful composition of matter; that it was novel; that it was previously unknown and was not anticipated by others; that the invention would not have been obvious to a person having ordinary skill in the art at the time of the claimed invention; that the patent issued is valid; and that the patent has been infringed.

The Court concludes that the plaintiff has not discharged its burden of proving a cause of action for misappropriation of a trade secret.

The foregoing may stand as the Court's findings and conclusions of law. Plaintiff's counsel will please prepare an appropriate decree.